## Richmond

WILLIAM ALLEN TOOMBS, ET AL.

V.

LYNCHBURG DIVISION OF SOCIAL SERVICES

March 12, 1982.

Record No. 801403.

Present: Carrico, C.J., Cochran, Compton, Thompson, and Stephenson, JJ., and Harrison, Retired Justice.

*J. Barrett Jones* for appellants.
*Walter C. Erwin, III, Assistant City Attorney; Sherwood S. Day, Guardian ad litem,* for appellee.

CARRICO, C.J., delivered the opinion of the Court.

This appeal by William Allen Toombs and Glenda Carol Toombs challenges final orders entered pursuant to Code § 16.1-283(C)(2).[1] The orders terminated the Toombs' residual parental

---

[1] § 16.1-283. *Termination of residual parental rights.* —
\* \* \*

C. The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
\* \* \*

2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

rights to three minor children and authorized the Lynchburg Division of Social Services to place the children for adoption.

A girl and two boys, all under the age of nine, are the subjects of this controversy. The children were entrusted to the Division by the mother on September 10, 1976, after she had attempted suicide earlier in the day. The Division placed the children in a foster-care home. At the time, the parents were separated and the father was incarcerated in the Lynchburg City Jail awaiting trial on a charge of "Grand Larceny by check." He was sentenced later to a term in the penitentiary.

The entrustment agreement was in effect six months, and on March 9, 1977, after a court hearing, the Division was awarded temporary custody of the children. This change in custody was ordered because the mother was not "any better able" to care for the children.

The mother had been a patient of the Central Virginia Mental Health Clinic since 1971. Diagnosed as suffering from "borderline mental retardation" and "schizoid personality disorder," she was hospitalized on at least one occasion. In addition, she received psychotherapy at the clinic and was given medication for home consumption; at times, she took dosages greater than prescribed.

In July, 1977, the father was released from prison, and he returned to live with the mother. The Division worked with him "towards a goal of returning the children," but the efforts were hampered because the parents moved often "from county to county," the father changed jobs frequently, and he remained unemployed for protracted periods.

In a further effort to prepare for the children's return, the Division and the parents entered into a written agreement in mid-1978. The agreement required the parents to obtain suitable living accommodations, secure adequate means of support or income, and provide a babysitter so the children would not be left alone with the mother.

The Division offered the parents counseling services, aid in obtaining food stamps and social security benefits, and transportation of the mother to the mental health clinic and other medical appointments. In addition, the Division attempted repeatedly to have the father obtain a psychological evaluation. A social worker made appointments for him and offered him transportation, but he resisted belligerently all efforts to have him examined. The father also discouraged the mother's visits to the mental health clinic and

attempted to dissuade her from taking the medication prescribed for her.

Although the parents were permitted to visit the children both in the foster home and in their own home, they exercised this privilege infrequently. At times, the parents failed to keep appointments for visitation and neglected to cancel them. After the children were entrusted to the Division in 1976, the father contributed nothing toward their support.

In August, 1979, the Division concluded that the parents "would not . . . ever be able to offer [the children] a stable, secure home with . . . continuity of care." The present petitions were then filed in juvenile and domestic relations district court. Thereupon, the Division terminated the parents' visitation with the children. The parents moved the court to order resumption of visitation, but the motion was denied. By orders entered December 21, 1979, the court terminated the parents' residual rights and authorized the Division to place the children for adoption.

The parents appealed to the circuit court, where they moved for reasonable visitation rights and for an independent background investigaton by John Turner, a family therapist. The court denied the motion for visitation, but ordered an investigation by Turner. He filed a written report and testified for the Division in the hearing below.

Turner recommended termination of parental rights. He based his recommendation on the length of time the children had been away from their natural parents, the infrequency of parental visitation, and the ages of the children. The witness stated that there was very little, if any, "psychological attachment . . . between the natural parents and the children." The natural parents, Turner continued, would "constitute psychological strangers at this point [in] time."

Turner also based his recommendation on the fact that the natural parents did not have the capacity to maintain the type of relationship with the children "that is necessary to promote . . . good healthy emotions and psychological growth." Turner said the children suffered a "developmental blank and . . . had a very rough time all the while they were living with their natural parents."

Turner complained that, because of the parents' uncooperative attitude, he had experienced "some difficulty" observing the "interaction between the natural parents and the children to deter-

mine [their] psychological attachment." Consequently, the court continued the matter so Turner could make a further evaluation of the situation. When the case returned to court ten days later, Turner testified he had observed the parents with the children and had talked individually with each child. He stated it was his opinion that the children "should not be returned to the parents at this point [or] at any point in the future."

On June 6, 1980, the court entered orders reciting that termination of residual parental rights was in the children's best interests and that the parents, "without good cause, have been unwilling or unable within a reasonable period to remedy substantially the conditions which led to the [children's] foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, and mental health or other rehabilitative agencies to such end." The orders terminated "all residual parental rights" and authorized the Division to place the children for adoption.

■ In their principal contention, the parents argue that the trial court should not have terminated their parental rights "after they had been denied visitation with their children" for the eight months between the time the petitions were filed in juvenile court and the date the case was heard in circuit court. The parents submit that Code § 16.1-283(C)(2), applicable here, requires social service agencies to assist parents in remedying the conditions which cause foster care placement; accordingly, the statute should be interpreted to forbid an agency's reliance thereon in termination proceedings when the agency itself has taken action, such as the Division took here, that tends to worsen conditions "allegedly militating in favor of termination."

The parents would have us read § 16.1-283(C)(2) to require parental visitation in every case where a social service agency assumes responsibility for the foster care of a child. The question must be resolved, however, in light of the facts of each case, with the best interests of the child as the guiding principle. Here, the Division determined that the best interests of the children dictated that parental visitation should not continue once the petitions were filed in juvenile court. The Division's determination was reviewed by both the juvenile court and the circuit court, and those courts, in the exercise of sound discretion, upheld the Division's action.

■ The parents do not claim that the circuit court abused its discretion in denying parental visitation. The parents say only that the motion for visitation was "denied prior to any evidentiary

hearing thereon." If this statement is intended as an assertion that the motion was denied without hearing, it is not supported by the record. Neither does the record indicate that the parents were denied an opportunity to present evidence in support of their motion. The action of the court with respect to the motion is presumed correct and, in the absence of a contrary showing, the presumption alone will support the court's denial of visitation.

■ The parents argue further that the trial court relied improperly upon Turner's testimony that the children did not regard their natural father and mother as their "psychological parents." Turner admitted, the parents assert, that the lack of visitation for the eight-month period would affect the children's attitude toward their parents. Therefore, the parents maintain, the Division's very action in terminating visitation caused the lack of psychological interaction upon which the trial court based its decision.

We reject this argument for three reasons. First, Turner did admit that, in most situations, the lack of parental visitation for eight months would have an effect upon the "psychological attachment of young children and their parents"; however, he made clear that the eight-month hiatus in the present situation did not affect his opinion that the parents were "psychological strangers" to the children.

Second, it is clear from the record that the trial court did not terminate the residual rights of the natural mother and father because the children did not regard them as their "psychological parents." Rather, in an oral opinion, the trial court confined the basis of its decision to the proposition that the parents' situation made it "inconceivable" that they would ever be able to "take [the children] back . . . and raise them and give them any sort of home and family life."

Finally, even during the three-year period in which the parents had visitation rights, their relationship with the children did not improve. Indeed, the record indicates that the relationship deteriorated during that period, due, in substantial part, to the infrequency with which the parents exercised their visitation rights.

■ Citing *Cleveland Board of Education* v. *LaFleur,* 414 U.S. 632 (1974), and other Supreme Court decisions, the parents argue next that one's right to visit his or her children is entitled to constitutional protection and that the Division's termination of visitation amounted to a denial of this right without due process. We point out, however, that when the Division initially terminated the

parents' visitation rights, the matter already was pending in juvenile court, and the parents had received proper notice. That court was available to the parents for a determination whether visitation should be resumed. The parents availed themselves of that forum, and their motion was heard and considered. Therefore, although the motion ultimately was denied, the parents did not suffer any deprivation of due process.

The parents' remaining two contentions actually present only one question, viz., whether clear and convincing evidence supports the trial court's finding that termination of parental rights is in the children's best interests and that the parents, without good cause and notwithstanding the reasonable efforts of social and rehabilitative agencies, failed to remedy substantially the conditions that led to the children's foster-care placement.[2] The parents argue that "[t]here were two conditions leading to the initial voluntary placement of the children in foster care: [the mother's] psychological problems and [the father's] incarceration." The latter condition was corrected, the parents say, when the father was released from prison, and the former was remedied by a combination of the mother's attendance at the mental health clinic and provisions the father made for a babysitter.[3]

Later, the parents maintain, the Division added two additional reasons for continuing the children in foster care: "the lack of a suitable place . . . to live and [the parents'] failure to gain the financial ability to provide for [the children]." The record shows, the parents insist, that, at the time of the hearing below, they had been established for a substantial period in a mobile home suitable for the children and that the father had made "great efforts" to work and earn enough to support the children. Thus, the parents conclude, although they did not have "the financial ability independently to care for their children," their failure was despite "diligent efforts" and thus was not "without good cause."

The record shows clearly, however, that although the father was released from prison in mid-1977, he has been neither able nor

---

[2] In a related case decided today, we held that the 1977 enactment of Code § 16.1-283 renders unnecessary a specific finding of parental unfitness in a contest between a parent and a social agency. Rather, we said, a finding that the factors listed in § 16.1-283 exist is tantamount to a finding of parental unfitness. *Knox v. Lynchburg Div. of Soc. Serv.*, 223 Va. 213, 220, 288 S.E.2d 399, 403 (1982).

[3] The father did not tell the trial court how he intended to pay the substantial amount the record indicates a sitter would charge.

willing to provide a suitable home for the children. He testified in the hearing below on April 25, 1980, that he had not been working and had not worked since "back there in November or December"; he and the mother were merely "living off of what income she could make out of food stamps." One of the parents' witnesses even opined that the father "would be a whole lot better off . . . if he would . . . keep one job," but he "keeps changing jobs." Concerning the mobile home the father said was suitable for the children, the Division's evidence showed the home would be overcrowded if the three children occupied it with their parents.

It is also clear from the record that the mother's psychological problems still prevent her from functioning properly as a parent. Although she and one of her witnesses said she had improved, a report from the mental health clinic, dated only a month before the trial below, stated that the mother "would not be able to care for her children properly, due to her mental health status and her intellectual abilities." The same report questioned whether the mother "really wants the responsibility for her children." Compounding the situation caused by the mother's psychological problems, the father refused persistently to submit to a psychological evaluation in the interests of his children, and he discouraged the mother from attending counseling sessions and taking her prescribed medicine.

In sum, we believe that overwhelming evidence supports the trial court's finding that the parents' failure to remedy the conditions that led to foster care placement was without good cause. The parents argue, however, that the failure of the Division to comply with the provisions of § 16.1-283(C)(2) contributed substantially to their inability to remedy their problems.

At "no time," the parents say, did the Division or any other rehabilitative agency give them "any assistance whatsoever toward the end of becoming financially stable." The parents contend that, although they "attempted to accomplish those tasks" the Division said were necessary for the return of their children, the Division "simply gave up" on them because it was "interested merely in placing the children for adoption." The Division's failure to render remedial assistance, the parents maintain, dictates the same result that was reached in *Weaver* v. *Roanoke Dept. of Human Res.,* 220 Va. 921, 265 S.E.2d 692 (1980), *viz.,* reversal of the orders terminating residual parental rights.

In *Weaver,* a father voluntarily entrusted his children to a social service agency. We reversed an order terminating his residual parental rights because nothing in the record indicated "what measures, if any, were taken by rehabilitative agencies to provide him with assistance in remedying his financial inability to provide for his children, which was the reason for foster care placement." 220 Va. at 928, 265 S.E.2d at 697.

Here, the father's financial inability to provide for his children was only one of a myriad of problems that led to foster care placement. In any event, the trial court found that the Division had done "everything [it] reasonably could to try to restore [the] children to [the parents'] home." With respect to the financial problem, the Division provided the parents aid in obtaining food stamps and social security benefits. And, of no little consequence, the Division has relieved the father since 1976 of the burden of supporting his three children, a period of sufficient length to permit him to bring at least a modicum of stability to his financial affairs; yet, he has made little, if any, progress toward that end.

We hold that clear and convincing evidence supports the trial court's finding that termination of residual parental rights is in the children's best interests and that the factors listed in Code § 16.1-283(C)(2) are present. Accordingly, we will affirm the orders appealed from.

*Affirmed.*