COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Haley and Senior Judge Coleman


DEBORAH PORTERFIELD

MEMORANDUM OPINION[*]
v.        Record No. 2156-06-3                    PER CURIAM
                                              DECEMBER 12, 2006
ROANOKE CITY DEPARTMENT
  OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Charles N. Dorsey, Judge

(Scott R. Geddes; Scott R. Geddes, P.C., on brief), for appellant.
Appellant submitting on brief.

(William M. Hackworth, City Attorney; Heather P. Ferguson,
Assistant City Attorney, on brief), for appellee.  Appellee
submitting on brief.

(Ellen S. Weinman, on brief), Guardian *ad litem* for the infant
child.  Guardian *ad litem* submitting on brief.


Deborah Porterfield contends the trial court erred in terminating her parental rights to her

minor child.  For the reasons stated, we affirm the trial court's decision.

Background

We view the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).  Before the child came into the

custody of the Roanoke City Department of Social Services on November 11, 2004, he was in

the custody of Dwayne Farmer, who was living with the child's mother.  Farmer is not the

child's biological father but is the father of the mother's two girls.  Farmer indicated he could not

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

meet the child's needs and signed an entrustment agreement delivering the child to the Department.

The child suffers from DiGeorge Syndrome, a genetic condition which has caused him numerous health problems, including heart defects, abnormal facial features, thymus underdevelopment, a cleft palate, and hypocalcemia, a shortage of calcium in his blood. When the Department obtained custody, the child was seven years old. He had only a few teeth, all of which had been capped, and he was not completely toilet trained. The child needed surgery on his tear ducts and had a hearing deficit in his left ear which necessitated his wearing a hearing aid. His speech could not be understood to an "untrained" ear, and he used nonverbal gestures to communicate. Later testing revealed he did not know the alphabet or how to write his name.

Initially, the Department established a goal of "return home" to the mother. To achieve that goal, mother was required to participate in parenting classes, and to undergo a psychological evaluation. She had undergone a prior psychological evaluation in connection with the child's younger siblings. The Department also recommended that a guardian be appointed to assist mother in meeting her day-to-day functions, such as paying bills and managing finances.

Mother met with Dr. Doris Nevin on August 12 and September 12, 2005, to complete the psychological evaluation. Dr. Nevin found that mother suffered from mild mental retardation and that her "adaptive functioning [wa]s at a very low level which would make it difficult for her to manage the daily activities of caring for herself and others . . . particularly in regards to caring for any child with special needs." Dr. Nevin noted that mother suffered from a serious cardiac condition as well as significant dental problems. In Dr. Nevin's opinion, mother's intellectual limitations were such that she was unlikely to meet the "complex needs" of her son.

Sharon Brammer began providing counseling services to the child in December 2004. Initially, he was "extremely violent." Brammer described him as "one of the most aggressive

children that [she] ha[d] seen," displaying behaviors such as growling, primal screaming, and killing play figures. He also exhibited "indiscriminate attachment patterns," i.e., he became excessively attached to individuals with whom he had relatively brief interaction. Brammer explained that such behavior occurs when a child "has not learned to use a single caregiver as an attachment figure."

Upon observing the child's interactions with mother, Brammer concluded a "disturbed attachment pattern" existed between them which consisted predominantly of a "negative kind of teasing." Mother initiated the teasing, and the two would "banter back and forth and call [each other] bathroom words."

> As the sessions went on, [the child] began to realize that this was escalating, and so he would kind of withdraw from her . . . and try to de-escalate the situation. So, he actually began to take a parent role. And I noticed he was also detaching from her in the waiting room. He would, he would be sitting in the foster mother's lap, or the foster brother's lap, with his back to her and the foster mother would have to actually tell him to go up and speak to his biological mother.

Brammer also noted mother had great difficulty in setting limits for the child, even after Brammer modeled appropriate discipline techniques for her.

Brammer testified the child had made "great progress" in his behavior at school and in his foster home since she first began working with him. The evidence proved the child had earlier received numerous suspensions from school and riding the school bus as the result of hitting students and staff, biting, and throwing objects. His foster mother, Sharon Fellows, described him as "completely defiant" initially, but stated his behavior "started turning around" within a couple of weeks of receiving appropriate limits. Fellows requested a study at the child's school to determine whether his educational needs were being met, and she assisted him with his homework so that he could stay on task. She noted he was doing "very well" in school and "instead of being insufficient, [was] making progress." Fellows testified that the child had

undergone two surgeries since his placement with her and that his medical needs required "at least six appointments a month."

Analysis

The trial court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2). That section states as follows:

> The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
>    *    *    *    *    *    *    *
>
> The parent or parents, without good cause, have been unwilling or *unable* within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

(Emphasis added.)

Mother argues the trial court erred in terminating her parental rights because the Department failed to show, by clear and convincing evidence, that she had been unwilling or unable to remedy the conditions which led to or required the continuation of the child's foster care placement because she "met all the requirements . . . set forth in the foster care plan." We disagree.

When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests. See Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230, 288 S.E.2d 405, 407-08 (1982); Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990). On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory

- 4 -

requirements, and made its determination based on the child's best interests." <u>Farley</u>, 9 Va. App. at 329, 387 S.E.2d at 796. Furthermore, "we will not disturb the trial judge's finding unless it is 'plainly wrong or without evidence to support it.'" <u>Richmond Dep't of Soc. Servs. v. Crawley</u>, 47 Va. App. 572, 580, 625 S.E.2d 670, 674 (2006) (quoting <u>M.G. v. Albemarle County Dep't of Soc. Servs.</u>, 41 Va. App. 170, 181, 583 S.E.2d 761, 766 (2003)).

Although the foster care service plan acknowledges mother's attendance at the recommended parenting classes, it also notes her "lack of comprehension." Mother's inability to comprehend the material taught in the parenting class is consistent with Dr. Nevin's findings that her limited intellectual functioning rendered her unable to care for a special needs child. In fact, Dr. Nevin testified mother was unable to identify the grade the child attended in school. Mother's attempts to cooperate with the Department in meeting the conditions for the child's return, while commendable, were not sufficient to establish her ability to remedy the conditions which led to the child's placement.

Our decision in this case is controlled in great measure by our decision in <u>Richmond Dep't of Soc. Servs. v. L.P.</u>, 35 Va. App. 573, 546 S.E.2d 749 (2001). We held that a parent's inability to remedy the conditions which led to the child's placement is not excused where the "parent's mental deficiency . . . is of such severity that there is no reasonable expectation that such parent will be able within a reasonable period of time befitting the child's best interests to undertake responsibility for the care needed by the child in accordance with the child's age and stage of development." <u>Id.</u> at 585, 546 S.E.2d at 755. Thus, we held in <u>L.P.</u>, that the parent's mental deficiency does not constitute "good cause" under Code § 16.1-283(C)(2). 35 Va. App. at 585, 546 S.E.2d at 755.

"[W]hen considering a termination of parental rights, 'the child's best interest is the paramount concern.'" <u>Crawley</u>, 47 Va. App. at 579, 625 S.E.2d at 673 (quoting <u>Wright v.</u>

Alexandria Div. of Soc. Servs., 16 Va. App. 821, 827, 433 S.E.2d 500, 503 (1993)). "'[I]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming . . . responsibilities.'" Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995) (alteration in original) (quoting Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1995)). "[In Lecky] we ordered termination of the mother's parental rights partially because the record did not suggest 'that the mere passage of time would resolve her difficulties.'" Crawley, 47 Va. App. at 581-82, 625 S.E.2d at 674-75 (quoting Lecky, 20 Va. App. at 312, 456 S.E.2d at 541). We also noted the mother and child were "emotionally distanced." Lecky, 20 Va. App. at 309, 456 S.E.2d at 539.

The evidence in this case established that the mother suffers from mental deficiencies that render her unable to meet the child's needs. The evidence also showed that a "disturbed attachment pattern" existed between the child and his mother and that the child had developed "indiscriminate attachment patterns" toward outsiders due to his failure to attach properly to a primary caregiver. Brammer testified the child grew so detached from mother that he would not speak to her without encouragement from his foster mother. Brammer also noted that the child who initially was "extremely violent" when he began therapy, had made "great progress" in his behavior at home and at school since his placement in foster care. Likewise, the foster mother stated that, with daily support, the child was "making progress" and was doing "very well" in school.

"Nothing in this record . . . suggests that the mere passage of time would resolve [mother's] difficulties." Id. at 312, 456 S.E.2d at 541. "[F]urther delay would prolong [the child's] familial instability without the promise of benefit to him, a result clearly contrary to the child's best interests." Id. Cf. L.G. v. Amherst County Dep't of Soc. Servs., 41 Va. App. 51,

581 S.E.2d 886 (2003) (mother possessed innate ability to improve her parenting skills, albeit beyond the twelve-month period contemplated by the statute). As in L.P., "the mother's mental deficiency in this case does not prevail over the child's best interests." L.P., 35 Va. App. at 585, 546 S.E.2d at 755.

We note that mother's parental rights to the child's siblings already had been terminated, thereby providing an additional basis for the trial court to conclude she was unable to remedy the conditions which led to the child's placement. See Fields v. Dinwiddie County Dep't of Soc. Servs., 46 Va. App. 1, 8, 614 S.E.2d 656, 659 (2005) (under Code § 16.1-283(E), "[a] finding of a prior termination substitutes for a finding that the parent had failed to remedy the conditions leading to the child's foster care placement"). Nevertheless, mother argues that the trial court erred in finding the evidence sufficient to warrant termination under Code § 16.1-283(C)(2) after concluding termination was not warranted under Code § 16.1-283(B). While the trial court based its ruling on Code § 16.1-283(C)(2) rather than Code § 16.1-283(B) or Code § 16.1-283(E), it made no findings regarding the sufficiency of the evidence under subsection (B). In any event, as appellant failed to present this argument to the trial court, we decline to address it for the first time on appeal. See Rule 5A:18.

Clear and convincing evidence proved that the mother's mental capacity rendered her unable to remedy the conditions which led to the child's placement in foster care. Therefore, we affirm the trial court's decision.

Affirmed.