COURT OF APPEALS OF VIRGINIA


Present:   Judges Kelsey, Petty and Senior Judge Bumgardner


LISA SEIWELL

                                                          MEMORANDUM OPINION[*]
   v.  Record Nos. 0908-09-3 and                               PER CURIAM
               0909-09-3                                    NOVEMBER 10, 2009


HARRISONBURG ROCKINGHAM
  SOCIAL SERVICES DISTRICT


FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
James V. Lane, Judge

(Roland M. L. Santos, on briefs), for appellant.  Appellant
submitting on briefs.

(Kimberly Van Horn Gutterman, Assistant County Attorney; Dawn
Wine Ruple, Guardian *ad litem* for the minor children, on brief),
for appellee.  Appellee and Guardian *ad litem* submitting on brief.


Lisa Seiwell (mother) appeals from a decision terminating her parental rights to her two

sons, W.W.[1] and D.W.[2]  Mother argues that the evidence was insufficient to support the trial

court's decision.  Upon reviewing the record and briefs of the parties, we affirm the decision of

the trial court.

Background

We view the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] W.W. was born August 4, 1998.

[2] D.W. was born February 6, 1997.

So viewed, the evidence proved that the Harrisonburg Rockingham Social Services District (HRSSD) had been involved with mother and her family since November 2006. Officials at the children's school filed complaints that the children were "smelly" and "filthy." The children regularly wet their beds and attended school smelling of urine. Subsequently, officials reported that W.W. attended school with a bump, bruise, and small gash on his head. Another complaint followed after W.W. sustained a burn on his chest.

On April 16, 2007, HRSSD filed a petition charging mother with abuse and neglect. The juvenile and domestic relations district court (juvenile court) entered a preliminary protective order on April 20, 2007, directing mother to undergo a psychological evaluation and individual counseling, and to allow visits by social services. The court specifically ordered mother to supervise the children properly, refrain from verbal abuse, ensure that the children were clean and well-fed, and to allow the children to have social interaction.

The juvenile court concluded mother had not provided the children with adequate food, shelter, clothing or supervision since November 2006. The juvenile court adopted as true the facts contained in an affidavit filed by HRSSD in support of the protective order. That affidavit stated that mother had received services from HRSSD since 2003 and that over the past several months, mother had abdicated her parental responsibilities while mother and her live-in boyfriend, Joel Will, used the computer. All three children cooked their own meals, did their own laundry and that of their mother, and prepared themselves for school. The children were injured on two occasions because mother failed to supervise them while she was on the computer. The affidavit stated further:

> Ms. Seiwell only leaves the computer to use the bathroom and sleep. As of March [20]07 Ms. Seiwell had stopped bathing and stopped getting dressed and stayed in her pajamas all day in front of the computer. Ms. Seiwell has quit her job in December of [20]06 and has not gotten another one. Ms. Seiwell and Mr. Will told the children that they are taking medication for mental issues,

are going through a hard time and the children need to be on extra good behavior because of this. . . . The children feel that any question or comment made to the mother is replied [to] by an angry remark or shouting. Due to this, [C.W.][3] confines herself to her room. . . . [W.W.] was observed to cry and "curl up in a corner whimpering like a dog" after Mr. Will screamed at him. Another time when [C.W.] was frying an egg, she wet her pants rather than ask her mother to watch the stove while she excused herself to use the bathroom, fearing that her mother would yell at her.

\* \* \* \* \* \* \*

All three children suffer from enuresis. [C.W.], with the help of the mentor provided by DSS appears to be overcoming this problem, but the boys routinely wet the bed. Odor of urine from the urine soaked sheets and the animals filled the house. The family has currently moved to a trailer which DSS helped pay for and had to get rid of the animals. There are concerns of the children not having enough food to eat. The children don't eat breakfast and have gone to the neighbor's [home] for dinner because there is not enough food at home.

At school [W.W.] and [D.W.] have been observed to have dirty clothes, smelling of urine with an overall disheveled appearance. Despite numerous conversations about this issue with Ms. Seiwell, their conditions have not improved. In a recent conversation . . . Ms. Seiwell . . . became hostile [and] . . . stated to [the social] worker five times to take her children and that life would be easier if DSS would take them.

The juvenile court entered an order on August 9, 2007, which, in addition to the directives contained in the preliminary order, precluded mother from moving the children from Rockingham County. The order specifically notified mother that the juvenile court could remove the children at the review hearing scheduled for September 12, 2007, should mother fail to comply.

---

[3] C.W. is the older sister to W.W. and D.W. but was not subject to the termination proceeding due to her age.

- 3 -

HRSSD provided in-home services to mother throughout the summer of 2007, including assistance with parenting, transportation, and employment. HRSSD had already provided services in the form of food stamps, a deposit for the family's trailer, a big brother for D.W., mentoring for C.W., and a psychological evaluation for mother. Mother had been unemployed since November 2006.

Prior to the review hearing, mother sought permission from the juvenile court to relocate the children to Washington State. Although the court denied the motion, mother moved the children with her to Washington on September 24, 2007, to be with a man she had met over the internet in February 2007. At that time, mother was being evicted from her home. On November 2, 2007, the children were removed from mother's custody and returned to Virginia. Mother remained in Washington for approximately another year after the children's removal.

The initial goal after the children's removal was to return them to mother. Mother continued to have weekly phone calls with the children through January 2008. After receiving complaints that mother was upsetting the children by promising to reunite with them and/or to send them gifts, HRSSD restricted the phone calls to supervised phone contact for fifteen minutes every other week. Mother was employed in Washington, but did not attend parenting classes or counseling. She saw the children on only one occasion from the time of their removal until November 20, 2008.

At that time, more than twelve months after the children's removal, HRSSD prepared a new service plan changing the goal to adoption. Mother moved from Washington in December 2008, but did not return to Virginia. Instead, she moved to New York to be close to her mother and other family members. HRSSD attempted to arrange a visit between the children and their mother in January 2009, but mother lacked the funds to make the trip from New York.

On February 2, 2009, the juvenile court terminated mother's residual parental rights pursuant to Code § 16.1-283(C)(2). Mother appealed that decision to the trial court, which

conducted an *ore tenus* hearing on April 24, 2009. The foster mother, Becky Gregory, testified that the two boys, as well as their older sister, C.W., lived with her and her husband from the time of their removal in November 2007 until D.W. and C.W. moved out in February 2009. All three children wet the bed on a regular basis, but would not tell Gregory about it. Instead, she testified, "They would get up and go to the bathroom after they had already wet the bed, go get a towel and lay it down and then lay down on top of it." The boys did not know how to urinate into a toilet or to wipe properly after bowel movements. The children did not brush their teeth and resisted Gregory's requests to shower.

Shortly after the children's placement with her, Gregory took C.W. to the doctor because her urine was foul smelling. She was diagnosed with a urinary tract infection. D.W. also received medical attention after Gregory noticed he had difficulty hearing. The doctor told Gregory D.W. had a permanent hearing loss of thirty five percent in both ears. The Gregorys provided D.W. with hearing aids.

Gregory also acknowledged that all three children experienced anger and anxiety, especially following phone contact with their mother. She noted that the children became especially upset when mother failed to follow through with promises to visit them or send them gifts over Christmas. The children's therapist testified that "[T]he boys . . . have been disappointed over and over again and have really lost faith. Even though they try desperately to hold on to that faith in their mom I think they really have lost faith." D.W. told the therapist his mother had "disappointed" and "lied" to him.

The relationship between the two boys was strained from the time of their placement and deteriorated over time, with episodes of physical violence. In November 2008, D.W. broke down with his therapist and cried for the first time. He told her no one – not his siblings, his mother, or foster family – loved or cared about him. Instead, he stated the family loved W.W.

Concerned that D.W. was at risk of being placed in residential treatment, HRSSD moved D.W. to a new "foster to adopt" home in February 2009. His therapist noted he was no longer at risk of residential placement since his relocation, that he appeared "more focused," and that his self-esteem had improved.

The therapist noted that W.W. was "very attached to the Gregorys and they with him[.]" The Gregory family wanted to adopt W.W., and encouraged visitation between W.W. and his brother and sister and expressed its willingness to continue such visitation after adoption.

Mother testified she was employed during the year she resided in Washington, but acknowledged she did not pay child support in 2008. Nevertheless, she claimed all of her children as dependents on her 2008 income tax return. She explained she did not attend the parenting classes in Washington because the classes focused on caring for infants and she was waiting for a class directed toward parenting older children. By the time such a class became available, mother had decided to relocate to New York.

After hearing and considering evidence and argument, the trial court granted the petitions to terminate mother's parental rights. It found that more than twelve months had passed and mother had failed to remedy the conditions which led to the children's removal. The trial court expressed concern about the instability in the children's lives resulting from mother's actions. Specifically, it noted that mother had failed to take advantage of the services provided to her in Virginia and had deliberately violated the juvenile court's order not to move the children out of state. Although the trial court expressed regret that the boys had been separated, it observed that they "seemed to be doing well now."

When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests. See Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230, 288 S.E.2d 405, 407-08

(1982); <u>Farley v. Farley</u>, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990).  On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests."  <u>Farley</u>, 9 Va. App. at 329, 387 S.E.2d at 796.  Furthermore, the evidence is viewed in the light most favorable to the prevailing party below and its evidence is afforded all reasonable inferences fairly deducible therefrom.  <u>Id.</u> at 328, 387 S.E.2d at 795.

Code § 16.1-283(C)(2) provides that the residual parental rights of a parent may be terminated if the trial court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Decisions to terminate parental rights under Code § 16.1-283(C)

> hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes.  Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

<u>Toms v. Hanover Dep't of Soc. Servs.</u>, 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005) (quoting <u>City of Newport News Dep't of Soc. Servs. v. Winslow</u>, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

The trial court's findings, "'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support [them].'"  <u>Logan</u>, 13

Va. App. at 128, 409 S.E.2d at 463 (quoting <u>Peple v. Peple</u>, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)).

The evidence established that mother received various levels of services, yet she was unable within a twelve-month period to remedy the conditions that brought the children into foster care. During the time mother had custody of the children, she did not attend to their basic needs or take advantage of the services offered to her. She deliberately violated a court order not to remove the children from Virginia and, after the children's removal, did not maintain visitation with the children or support them financially. HRSSD presented clear and convincing evidence that termination was in the best interests of the children and that mother was unable or unwilling within a reasonable amount of time to remedy the conditions that brought the children into foster care. Accordingly, the decision of the trial court is affirmed.

<u>Affirmed.</u>