COURT OF APPEALS OF VIRGINIA

Present:  Judges Beales, Russell and AtLee
Argued at Richmond, Virginia

UNPUBLISHED

TARSHA GERALD

v.      Record No. 0918-18-2

CHARLOTTESVILLE DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION* BY
JUDGE RICHARD Y. ATLEE, JR.
MARCH 19, 2019

FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
Melvin R. Hughes, Jr., Judge Designate

Steven S. Biss for appellant.

Sebastian Waisman[1]; Anthony Martin, Guardian *ad litem* for the
minor children (Allyson Manson-Davies, Deputy City Attorney;
Lepold & Freed, PLLC, on brief), for appellee.

This appeal concerns the Circuit Court of the City of Charlottesville's finding that Tarsha

Gerald's minor children, L.G.-G., born January 13, 2012, and C.T.-G., born February 14, 2014,

were abused or neglected, and its decision to award custody of the children to their respective

biological fathers.  For the following reasons, we affirm.

I. BACKGROUND

On appeal, we view the evidence in the light most favorable to Charlottesville

Department of Social Services ("DSS" or "CDSS"), who prevailed before the circuit court.

Surles v. Mayer, 48 Va. App. 146, 156 (2006).  So viewed, the evidence is as follows.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Although not named on brief, Mr. Waisman, from the Charlottesville City Attorney's
Office, argued on behalf of DSS.

On July 13, 2016, at 4:30 in the afternoon, the DSS on-call social worker received a report concerning Gerald and her minor children, L.G.-G. and C.T.-G., stating that they were sleeping in a car in front of 104 Oak Street in Charlottesville and that the children had been playing in the street and using an adjacent yard to use the bathroom. The social worker, accompanied by a patrol officer, responded to the address, and although they found a car matching the description in the report, it was unoccupied. The social worker asked the officer to do a "welfare check" later that evening. Shortly after midnight, the officer returned and found Gerald asleep in the car with the two minor children. The car was off, the windows were opened slightly, and all three were in the front seat. The officer knocked on the window to wake Gerald. He explained that they were only a few blocks from a high crime and drug trafficking area and that she and the children needed a safe place to stay that night. Gerald could not stay at the Oak Street address, where they were parked, because Gerald was subject to a protective order. Gerald proposed calling her mother, who lived in Waynesboro. She needed her mother to pick them up because Gerald's license was suspended, so she could not drive. While waiting, Gerald spoke with DSS and told them she would be staying at her mother's home at 1709 Main Street in Waynesboro. An hour later, her mother arrived and took Gerald and the children to her residence.

Two DSS workers, Christine Self and Morgan Minor, were assigned to the matter to provide foster care prevention assistance, the most pressing issue being assisting with obtaining safe housing for Gerald and the children. Self had worked on DSS matters involving Gerald in the past. On July 14, 2016, Minor reviewed the verbal safety plan Gerald had made the previous night. She learned that a violent sex offender was registered at the Waynesboro address, making it an unsuitable place for the children to stay. Minor immediately contacted Gerald, and Gerald agreed to meet with DSS that day. At that meeting, Gerald explained that the Waynesboro

address was her brother's address, although her mother also lived there. She said the individual who was registered as a sex offender was in a relationship with her mother. She explained that she was aware of his status and never left the children alone with him.

When asked for alternative options for where she could stay with her children, Gerald could not offer one stable place. Instead, she offered a variety of locations where they could stay intermittently, including the Waynesboro address (which DSS deemed unacceptable), the Red Roof Inn, or her cousin's house; however, her cousin could only host guests for two weeks at a time as a condition of her receiving public assistance. Minor suggested a safety plan where each child stayed with his or her biological father (Gerald had, in fact, left C.T.-G. with his father during this meeting). Gerald refused because she said the fathers lived with their families and sold drugs.

Gerald insisted on speaking with Self. After discussing options with Gerald, Self arranged for Gerald and the two minor children to stay at the Salvation Army shelter, the only overnight shelter available. DSS created a mutually-agreed-upon safety plan which Gerald signed. This safety plan expressly stated that Gerald agreed to "remain/reside at the Salvation Army with the . . . children until housing approved by DSS is secured." The signed, written document also warned that "failure to comply with these requirements could result in the need for CDSS to remove the child(ren) from my care or custody or seek other appropriate action from the [c]ourt."

Gerald did not follow the safety plan. A case manager from the Salvation Army, Alexandra Orton, testified that Gerald checked into the shelter on July 14, 2016, but was not there at 6:30 a.m. on July 15, 2016, when Orton tried to meet with her, review shelter rules, and open her case to services. In fact, Gerald did not return to the shelter for over an entire weekend, from July 15, 2016 to July 18, 2016.

When Self and Minor returned to work on Monday, July 18, 2016, they learned that Gerald and the children had not stayed at the Salvation Army shelter as agreed. They, along with other DSS workers, went to the various addresses Gerald had provided as options for where she could stay (but that DSS had found unsuitable for various reasons). They found Gerald at her cousin's house and determined that the children were inside. Gerald was in the driveway but would not let the DSS workers see the children or go inside the residence. Over the course of thirty minutes, Gerald and her cousin were "adamant" that DSS did not need to enter the home, and they continued to refuse to let DSS see the children or enter the house. Minor testified that Gerald made threats and was emphatic that she would not work with child protective services. Because of the hostile environment and concern for the safety of both the children and the workers, DSS requested police assistance. After the police arrived, the situation continued for nearly an hour, with Gerald continuing to hold her ground and refuse access to the house or the children. Minor contacted her supervisor, Nicole Shipp. Shipp testified that she performed a safety assessment on Gerald and her children to determine if removal was appropriate. Gerald and her family had a history of "noncompliance . . . as far as formal systems go, CPS, courts, law enforcement," which factored into how the situation was handled. In light of the immediate escalating circumstances, and in addition to other factors such as Gerald's extensive history with DSS, Shipp determined that removal was necessary and executed emergency removal of the children on the grounds that the children were in danger of imminent threat to their life or health.

On September 14, 2016, the Charlottesville Juvenile and Domestic Relations District Court ("J&DR" court) entered dispositional orders finding the children were at risk of abuse or neglect and giving custody of the children to their respective fathers.[2] Gerald appealed to the

---

[2] Prior to this, the J&DR court had already timely conducted the emergency and preliminary removal hearings and made the requisite findings. See Farrell v. Warren Cty. Dep't

- 4 -

circuit court, which heard additional evidence regarding Gerald's circumstances and behavior since the J&DR disposition, as well as how the children were faring under the care of their fathers. After closing arguments, the circuit court took the matter under advisement for further review. It ultimately concluded there was sufficient evidence of abuse and neglect and ordered that the children remain in the custody of their fathers. In its orders, the circuit court expressly found that for each child,

> 1. Since the Child was removed, there have been numerous attempts on the part of service providers to assist [Gerald], including, but not limited to, supervised visitation, safety plans, and housing inspections.
>
> 2. Communication between [Gerald] and CDSS has been extremely tense and she has been consistently resistant to services.
>
> 3. [Gerald] has staunchly objected to the removal of the Child from her custody.
>
> 4. [Gerald] has displayed a continuing pattern of unstable and uncertain housing accommodations since the Child's removal.
>
> 5. At the December 1, 2017 hearing [Gerald] had been evicted from her most recent residence and was residing at the Oak Street address temporarily with frequent stays in Richmond, Virginia.
>
> 6. [Gerald's] witness, Mr. Benjamin Camp, described her in a state of "transition" which the Court finds is an apt description of her pattern of continued, unstable, uncertain housing accommodations for her Child.

Relying on these findings, the circuit court found sufficient evidence of abuse or neglect and, agreeing with the recommendation of the Guardian *ad litem*, ruled that the children should remain in the custody of their respective biological fathers. Gerald timely filed this appeal.

---

of Soc. Servs., 59 Va. App. 342, 345-46 (2012) (describing, in detail, the process leading from an emergency removal to the circuit court's review, the timing of that process, and the necessary factual determinations).

II.  ANALYSIS

Gerald argues that the circuit court erred in several respects.  First, she argues that the petitions for emergency removal failed to comply with Code § 16.1-251 because the removal took place over four hours before DSS obtained a court order and the affidavit or sworn testimony before the court failed to state the reasons for that delay.  Second, she argues that the removal and custody orders were not supported by sufficient evidence.  Third, she argues that the circuit court erred because it failed to make the requisite findings under Code § 16.1-278.2(A1) in order to transfer custody to a relative or interested party.  Finally, she argues she should have received attorneys' fees.  These arguments all lack merit, and we affirm for the following reasons.

### A.  Timing of Emergency Removals

Gerald first argues that the emergency removal orders violated Code § 16.1-251(A)(2) because there was no explanation provided for the failure to obtain an emergency removal order within four hours of taking custody of the children.  Code § 16.1-251(A)(2) states as follows:  "If the petitioner fails to obtain an emergency removal order within four hours of taking custody of the child, the affidavit or sworn testimony before the judge or intake officer shall state the reasons therefor."

This Code provision applies to emergency removals orders, which are issued by J&DR courts.  As such, although she argues that the "Circuit Court erred," Gerald's first argument solely concerns the actions of the J&DR court, over which this Court has no jurisdiction.  See Code § 17.1-405 (explaining, *inter alia*, the appellate jurisdiction of the Court of Appeals in custody cases); Code § 16.1-296 (setting out the circuit court's appellate jurisdiction over final orders or judgments of a J&DR court).  Neither the emergency removal orders, nor any

equivalent orders, were before the circuit court. Accordingly, this Court lacks jurisdiction to address this assigned error.

### B. *Sufficiency of the Evidence*

Gerald challenges the sufficiency of the evidence supporting the petitions for emergency removal and preliminary removal, as well as the dispositional orders.[3] Specifically, she argues the evidence did not show

> (a) that Gerald abused or neglected her Children, (b) that the Gerald Children were subject to an "imminent threat to life or health to the extent that severe or irremediable injury would be likely to result" if the Children were left in the custody of Gerald; *and/or* (c) that reasonable efforts had been made to prevent removal of the Gerald Children from their home and there were no alternatives less drastic than removal.

In order for a J&DR court to enter emergency and preliminary removal orders, DSS must prove, by a preponderance of the evidence, "1) imminent threat of injury or irremediable harm; 2) [that DSS made] reasonable efforts to prevent removal from the home; and 3) [that] no less drastic alternative than removal exists." Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App.

---

[3] As a threshold matter, Gerald's assignments of error challenge orders from the J&DR, not circuit, court. Gerald's second assignment of error argues "[t]he Circuit Court erred when it granted Charlottesville DSS'[s] petitions for emergency removal and preliminary removal pursuant to § 16.1-251 (A) and § 16.1-252 of the Code . . . ." Her third assignment of error argues that the "[t]he Circuit Court erred when it made its Dispositional Orders pursuant to § 16.1-278.2 of the Code." (She also fails to include in this third assignment of error any citation to the record as to where this objection was preserved, see Rule 5A:20(c).)

Although Gerald states that the petitions for emergency removal, preliminary removal, and the dispositional orders were entered by the circuit court, these arguments solely address actions of the J&DR court. Not only were the orders Gerald references entered by the J&DR court, but the code sections she cites in her assignments of error also refer to proceedings within a J&DR court. These orders are not appealable to this Court, cf. Code § 17.1-405, and at no point, in challenging the evidence supporting the finding of abuse or neglect, does Gerald assign error to the circuit court's final orders. Nevertheless, because it is clear from her arguments on brief and at oral argument that she challenges the circuit court's orders, which were heard on appeal of the J&DR court's dispositional orders, and because appellees do not argue that these assignments of error are defective, we do not find these errors so significant as to require dismissal. Rule 5A:1A ("This Court *may* dismiss an appeal or impose such other penalty as it deems appropriate for non-compliance with these Rules." (emphasis added)).

375, 385 (2012). At either a preliminary or dispositional hearing, DSS must also show that the child meets one of the statutory definitions of a "abused or neglected child," which, as relevant here, means showing the child's parent "creates a substantial risk of death, disfigurement or impairment of bodily or mental functions . . . [or] neglects or refuses to provide care necessary for his health." Code § 16.1-228. On appeal from the J&DR court, a circuit court reviews the case *de novo*. Code § 16.1-296.

This Court reviews the circuit court's rulings more deferentially. "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)). "'[T]here is no simple, mechanical, cut and dried way' to apply the best interests of the child standard." Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 48 (2014) (quoting Peple v. Peple, 5 Va. App. 414, 422 (1988)). "Instead, 'the question must be resolved . . . in light of the facts of each case.'" Id. (quoting Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230 (1982)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)). "If reasonable jurists could disagree about the probative force of the facts, we have no authority to substitute our views for those of the trial judge." Joyce v. Commonwealth, 56 Va. App. 646, 664 (2010) (quoting Campbell v. Commonwealth, 39 Va. App. 180, 186 (2002)).

Here, the evidence reflects that DSS first became involved in this matter because Gerald and the children were sleeping in a car near a dangerous neighborhood known for high crime

rates and drug trafficking. At the time, the children were very young — only two and four years old. When an officer told Gerald she needed to take the children somewhere safer, she first took them to a house that, although her mother lived there, was listed as the residence of a registered sex offender, a fact Gerald knew. When DSS learned of this and met with Gerald, she agreed to a written safety plan, which required her to stay with the children at the Salvation Army shelter until DSS could find and approve safe and appropriate housing. The signed, written document also warned Gerald of the possible consequences of non-compliance: "Failure to comply with these requirements could result in the need for CDSS to remove the child(ren) from my care or custody or seek other appropriate action from the [c]ourt."

Gerald did not follow this plan. Instead, she took the children to her cousin's house, which DSS had previously found unsuitable when developing the safety plan with Gerald. Although Gerald offers various explanations for why she found the Salvation Army shelter to be unsafe, the record directly refutes Gerald's claims.[4] Although she had expressed some reluctance to stay at the shelter in a phone call with Self, at no point did anyone give her permission to stay anywhere but the Salvation Army shelter, nor did she alert DSS when she unilaterally decided to take the children elsewhere.

Gerald argues, despite there being a space open in the Salvation Army shelter, that DSS should have provided her with other options, and thus failed to make "[r]easonable efforts . . . to prevent removal of the child[ren]." Farrell, 59 Va. App. at 385. For example, she argues that she could have gone to another shelter despite the fact that it did not provide overnight lodging for families. She also argues that she could have spent a portion of her savings on lodging at a

---

[4] Gerald states that she felt unsafe and that the shelter was full of "drunks" and was terrifying. Orton, the Salvation Army case manager, testified that Gerald and her children had a private room, that the shelter is monitored "24/7," that substance abuse is strictly prohibited, and that sex offenders were not permitted access to the shelter.

local motel. Her primary argument is that DSS should have permitted her to stay in her cousin's home, despite the fact that this living arrangement raised numerous concerns, which is why DSS expressly declined to authorize her staying there when developing the safety plan. First, it could not be a long-term solution and offer stability to the children, as her cousin could not host guests for longer than fifteen days as a condition of receiving public assistance. More importantly, DSS had no opportunity to inspect the home and see if it was safe and adequate for the children. When DSS workers came to her cousin's home in an attempt to find the minor children, Gerald used profanity and threats towards the DSS workers, refused to let them see the children, and would not let them enter or inspect the home. Her behavior was so hostile that the workers called for police support. Although no home inspection took place, DSS workers noted, solely from the exterior of the home, that it may be unsuitable due to large amounts of trash and debris around the building. Regardless, to the dubious extent that these other options would have proved suitable in the short term, Gerald not only failed to provide DSS an opportunity to inspect and approve that possibility, but also, in contravention of her agreement in the written safety plan, relocated her children without notifying DSS and did not stay at the Salvation Army shelter.

Furthermore, DSS's determination that removal was appropriate was not made in a vacuum. Gerald had numerous reports, investigations, and family assessments over the years. Gerald also had a history of non-compliant and aggressive behavior towards DSS workers, so the hostile situation in the driveway of her cousin's house the day the children were removed was yet another instance of behavior they had seen in the past.

Even in the time after the emergency removal, but before the circuit court hearings, Gerald's behavior during visitation was questionable. The circuit court found that in the time since each child was placed with his or her father, while DSS provided supervised visitation and

attempted to arrange safety plans and housing inspections, these interactions with Gerald have "been difficult and strained." It noted that Gerald "resisted actions taken by social services representatives," and communication between her and DSS "has been extremely tense."

Finally, the evidentiary support for Gerald's arguments are largely drawn from her and her cousin's testimony on her behalf. The trial court is best equipped, particularly in heavily fact-dependent cases, to make judgments on credibility and weigh the evidence. See Sutherland v. Sutherland, 14 Va. App. 42, 44 (1992) ("[O]n review the 'decision of the trial judge is peculiarly entitled to respect for he saw the parties, heard the witnesses testify and was in closer touch with the situation than the [appellate] Court, which is limited to a review of the written record.'" (second alteration in original) (quoting Brown v. Brown, 218 Va. 196, 200 (1977))). To the extent that Gerald offered an alternative account of the facts, the circuit court was entitled to disbelieve that self-serving testimony. Accordingly, we cannot say the circuit court erred in finding sufficient evidence of abuse or neglect, or in ordering that the children remain with their fathers.

### C. Findings Required to Transfer Custody to Relative

Code § 16.1-278.2(A1) requires that a court transferring custody to a "relative or other individual" make certain express factual findings.[5] Gerald argues that the circuit court's

---

[5] In pertinent part, Code § 16.1-278.2(A1) states the following:

> Any order transferring custody of the child to a relative or other interested individual pursuant to subdivision A 5 a shall be entered only upon a finding, based upon a preponderance of the evidence, that the relative or other interested individual is one who, after an investigation as directed by the court, (i) is found by the court to be willing and qualified to receive and care for the child; (ii) is willing to have a positive, continuous relationship with the child; (iii) is committed to providing a permanent, suitable home for the child; and (iv) is willing and has the ability to protect the child from abuse and neglect; and the order shall so state. The court's order

- 11 -

"Dispositional Orders should be reversed because the Court failed to make the findings required by [Code] § 16.1-278.2(A1) and there was no evidence introduced to allow the Court to make such findings."

Gerald's argument overlooks a crucial issue — the circuit court did not transfer custody to a relative. Rather, it ordered that custody remain with the children's biological fathers (*i.e.*, it took custody away from Gerald). This is not a "transfer" of custody. Furthermore, although the statute provides no express definition of "relative," it is clear in context that the children's fathers are not "relatives" as contemplated by that code section. Gerald relies heavily on the fact that the circuit court's orders stated that "custody of the Child shall remain with the father pursuant to Va. Code § 16.1-278.2(5)(a)." The fact that the orders cite an inapplicable subsection does not bolster her argument, however.[6] It is apparent from the orders that the children were to "remain" with their respective fathers. The fathers were present for the proceedings, represented by counsel, and had a history of being responsible for their children's care and a part of the children's lives. No "transfer" to a "relative" took place. As the orders stated, the children remained with their fathers. Accordingly, the circuit court was not required to make findings pursuant to Code § 16.1-278.2(A1) and could not have erred in failing to do so.

---

transferring custody to a relative or other interested individual should further provide for, as appropriate, any terms or conditions which would promote the child's interest and welfare; ongoing provision of social services to the child and the child's custodian; and court review of the child's placement.

[6] In fact, the citation in the circuit court's orders does not refer to an existing subsection. Even if the circuit court intended to transfer custody to a relative, that would be subsection (A)(5)(a), not "(5)(a)." Under Code § 16.1-278.2(A)(5)(a), a court may, "[a]fter a finding that there is no less drastic alternative, transfer legal custody . . . [to a] relative or other interested individual subject to the provisions of subsection A1 of this section."

*D. Attorneys' Fees*

Finally, Gerald argues that the circuit court erred in failing to award her attorneys' fees pursuant to Code § 16.1-278.19. "An award of attorney's fees is a matter submitted to the trial court's sound discretion and is reviewable on appeal only for an abuse of discretion." D'Ambrosio v. D'Ambrosio, 45 Va. App. 323, 344 (2005) (quoting Graves v. Graves, 4 Va. App. 326, 333 (1987)). Gerald's argument fails for numerous reasons. First, Gerald failed to preserve the issue, as she did not file any motion before the circuit court and solely made a perfunctory reference to it during closing arguments. See Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling[.]"). Even if Gerald adequately preserved this argument, DSS would be shielded by sovereign immunity. "If the General Assembly had intended that the counties' departments of social services would have been subject to the discretionary assessment of attorneys' fees in all JDR court proceedings, then it would have said so expressly." Murphy v. Charlotte Cty. Dep't of Soc. Servs., 57 Va. App. 784, 791 (2011). Accordingly, "the trial court could not award attorney's fees to [Gerald] here, especially given the opposing party was the Department, a government agency protected by sovereign immunity." Id. at 793. For these reasons, the circuit court did not abuse its discretion in declining to award fees to Gerald.

III. CONCLUSION

Gerald's arguments, to the extent they were preserved, lack support from both the record and applicable law. Accordingly, we affirm the circuit court.

Affirmed.