COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges AtLee, Malveaux and Senior Judge Annunziata
Argued at Fredericksburg, Virginia


SARAH SWARTWOOD-DAVIS
                                                    MEMORANDUM OPINION* BY
v.        Record No. 2075-16-4                      JUDGE MARY BENNETT MALVEAUX
                                                    AUGUST 8, 2017
STAFFORD COUNTY DEPARTMENT
 OF SOCIAL SERVICES


                FROM THE CIRCUIT COURT OF STAFFORD COUNTY
                            Charles S. Sharp, Judge

            Kristin Kadar (The Law Office of Kristin Kadar, on briefs), for
            appellant.

            Catherine M. Saller (Jean M. Kelly, Guardian *ad litem* for the
            minor child; Law Office of Catherine M. Saller, PC, on brief), for
            appellee.


        The Circuit Court of Stafford County ("circuit court") entered orders terminating the

residual parental rights of Sarah Swartwood-Davis ("mother") to each of her four children, pursuant

to Code § 16.1-283(C)(2).  She appeals only the order pertaining to her eldest son, arguing that the

evidence did not prove she could not care for him, individually, once her rights to her other children

were terminated.  She alternatively argues that the court erred in finding that she had not

substantially remedied the conditions that led to his placement in foster care.  We conclude that the

evidence was sufficient to support both of the challenged findings and therefore affirm.

                                    I.  BACKGROUND

        We review the evidence in the light most favorable to the Stafford County Department of

Social Services ("DSS"), the party that prevailed below, affording it all inferences that are fairly

        _____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

deducible from this evidence.  See Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 40,

764 S.E.2d 284, 287 (2014).

Mother's eldest son, J., was nine years old at the time of this appeal.  He has three

half-siblings, who are the offspring of mother's relationship with David Davis.  At the time of

this appeal, his twin half-sisters, A. and E., were five years old and his half-brother, I., was four

years old.  Mother separated from Davis shortly before I.'s birth.  J.'s father, meanwhile,

apparently has not had contact with the child.

Mother's family first came to the attention of Stafford County's Child Protective Services

("CPS") in 2012, when the department received the first of six child abuse complaints.  The basis

of this first complaint was that mother had hit, kicked, and screamed at J. while at a doctor's

office.  In September 2013, while the case was still open, CPS received another complaint

indicating that A. had fallen out of a second-story window after mother left her and two of her

siblings unattended.

According to Karen Clark, a supervisor at CPS, the agency offered a number of services

and referrals to mother; however, CPS saw no improvement in her ability or desire to provide

appropriate care for her children.  CPS eventually filed Child in Need of Services petitions in

May 2014 after sheriff's deputies learned that A. and E. were playing in the street while mother

slept.  Clark explained that CPS filed these petitions because the agency "needed court

intervention to order services for the family."

Nevertheless, CPS continued receiving complaints indicating that mother's children were

being abused or neglected.  In September 2014, someone reported that mother's live-in boyfriend

had spanked A., who had bruises on her buttocks.  In March 2015, CPS learned that both A. and

E. had serious dental issues, including teeth that had decayed to a dangerous degree and

abscesses that had gone untreated for years.  In April 2015, someone called CPS to report that

mother was yelling and screaming at her children, who were living in a home not fit for their habitation. When CPS workers responded to this last call, they found that J. was not at home, and mother could not account for his whereabouts. CPS determined that this final call was a founded complaint of abuse and neglect.

At CPS's encouragement, mother temporarily placed her sons in their maternal grandmother's care and placed her daughters with their maternal great-grandmother. By July, however, the grandmother and great-grandmother began expressing doubts as to their ability to continue caring for the children.

On July 27, 2015, the children entered foster care. The following day, the Juvenile and Domestic Relations District Court of Stafford County ("J&DR court") entered emergency removal orders awarding custody of the four children to DSS.

In September 2015, DSS filed foster care service plans for the four children, specifying their goal as returning the children to their home. The plans stated that before DSS would consider returning the children, however, both mother and Davis would need to meet eight requirements. Among other requirements, the plans required both parents to undergo psychological evaluation and to follow the psychologist's recommendations. The plans required both parents to complete a domestic violence program. They required the parents to enroll in parental education classes and to demonstrate their ability to discipline and parent the children. And they also required the parents to secure a home appropriate for the needs of four children and to maintain its cleanliness for at least three months.

A. Mother's Mental Health

Around the time that DSS was finalizing the foster care service plans, mother was temporarily hospitalized due to suicidal ideation. In October 2015, she began seeing a psychiatrist through the Rappahannock Area Community Services Board. That psychiatrist,

- 3 -

Dr. T.K. Reese, later testified that mother suffers from bipolar disorder as well as a trauma disorder. Dr. Reese adjusted mother's medication in October 2015, adding a mood stabilizer to the mix of antidepressants she regularly takes. According to mother, although the original mix of medications led her to experience "[d]epressive mood swings, severe insomnia, random panic attacks, [and] nightmares," the adjusted medications made her feel "very level."

DSS staff members noted, however, that mother continued to behave aggressively during a number of her interactions with the department. In a foster care service plan review filed in December 2015, a DSS case worker observed that mother frequently failed "to control her anger and explosive behavior." Notes from an April 2016 meeting indicate the mother "became very angry and upset" and was "verbally abusive and threatening."

In March 2016, mother underwent a psychological evaluation. The examiner, Dr. Patrice Berry, concluded that mother's working memory measured in the "borderline" range, indicating that she had difficulty retaining the information necessary to solve problems or follow through on tasks. Dr. Berry also concluded that diagnoses of post-traumatic stress disorder, bipolar disorder, and generalized anxiety disorder were warranted after the examination and a review of mother's history. Dr. Berry recommended that mother participate in individual therapy provided by a licensed clinician.

Mother and DSS disputed whether she ever followed through on Dr. Berry's recommendation that she seek individual counseling. Devonne Johnson, a DSS case worker, testified that "to [his] knowledge, she ha[d] not received individual counseling." Notes from DSS team meetings in May and June 2016 indicate that mother was not receiving counseling.

Mother testified, however, that after an intake session in July 2016, she began receiving individual counseling in August.[1]

### B. Mother's Treatment as a Victim of Domestic Abuse

After rekindling their estranged relationship, mother and Davis married in June 2015, shortly before the children entered foster care. While the two sometimes argued with one another, they generally presented themselves to DSS as a concerned and supportive couple. Johnson observed during team meetings that Davis "was a source of support" to mother. But he also acknowledged that in the autumn of 2015, he spoke with mother "multiple times" about possible domestic violence in her relationship with her husband. On each occasion, mother denied that her husband was abusing her.

In March 2016, DSS learned that Davis had been arrested for physically assaulting mother. At that point, mother told DSS that the marriage had been a sham, reporting that Davis had physically and verbally abused her on multiple occasions since the previous November. She told Dr. Berry, meanwhile, that Davis had given her "countless black eyes" and had induced two miscarriages through physical abuse.

Mother also disclosed to Dr. Berry that she had been abused by both her mother and her stepfather. Additionally, Dr. Reese attributed her trauma disorder to her stepfather's abuse.

That same March, mother contacted Empowerhouse, an organization that coordinates support groups for domestic violence victims, for the first time. But while Empowerhouse hosts an open support group every Monday, mother did not attend her first meeting of that group until July 2016. She explained that it took her several months to attend her first meeting because she

---

[1] Although mother agreed under cross-examination that she had started counseling in August 2015, it appears that DSS's counsel had misstated the year. At another point in her testimony, mother explained that she had not started counseling earlier because she could not afford to pay twenty dollars each month to see both a counselor and her psychiatrist. Notes from her meetings with DSS staff indicate that she gave them this explanation in June 2016.

did not have transportation.[2]  And although Empowerhouse offers twelve-week, closed-group courses for domestic violence survivors, mother had not completed that program.  She testified that the first available closed-group program did not start until November 2016.

### C. Mother's Living Situation

In April 2016, mother began a romantic relationship with Thomas Myers, whom she described as a former "best friend" whom she had contacted because she "was going through a hard time."  That same month, she informed DSS that she would temporarily move in with Myers and his landlord.

Around that same time, mother and her husband's cousin, John Davis, began to discuss her renting his home.  In June 2016, mother announced to DSS that she and Myers planned to move into the home.  Mother explained that she and Myers would rent three of the single-family house's four bedrooms.  John Davis promised DSS, meanwhile, that his cousin would not be allowed inside the house after his release from jail.  Mother's official move-in date was July 1, 2016.

According to Johnson, the home initially did not provide adequate safe space for four children.  He testified that there were holes in the home's walls and that it lacked a working bathroom when mother first moved in.

DSS had separate reservations about mother's decision to move in with Myers.  A DSS supervisor, Karen Stidsen, explained that the department was concerned that such a move would be emotionally disruptive to the children, who still viewed Davis as their father.  DSS specifically denied a request by mother to introduce Myers as the next person in the children's lives because the department considered it contrary to the children's best interests.  Stidsen

---

[2] Although DSS began requesting that either mother or Davis obtain a driver's license as early as July 2015, mother had obtained only a learner's permit as of October 2016.

testified that mother's decision to bring the children into a home she shared with Myers was the reason that DSS found the residence unsuitable.

### D. J.'s Behavioral Issues and Emotional Needs

According to Frank Valentine, the director of a counseling group that worked with J., the child has "a significant history of emotional dysregulation" and "excessive anger outbursts in the home." He also has a history of similar behavior problems at school. At times, J. would yell or scream in the classroom with "significant intensity and severity." At other times, J. would become withdrawn, hiding beneath desks to avoid taking responsibility or following through on classroom tasks.

Valentine opined that J.'s angry behavior is triggered by his impression that he must compete with others to ensure that his physical and emotional needs are met by his caregivers. He testified that J. requires consistency in his environment to reduce the stressors that trigger his need to control or compete with others.

Johnson separately observed that J.'s desire to control other people and situations caused friction with his foster families. Although DSS initially placed J. and I. in the same foster home, J.'s impulse to compete with I. and the family's other children caused tension and led him to behave aggressively towards his brother. About a month later, DSS placed J. in a new foster home that he shared only with his foster parents and their seventeen-year-old son. Johnson observed that J. did best in this environment; however, the family moved out of Virginia, requiring DSS to place J. in a third foster home. Johnson said that J. was "adjusting slowly" to this last foster home. He observed in general that J. "has had a very difficult time in foster care," and has "not really connected with many of the foster parents and people he has worked with in care."

During visitation, mother also had difficulty managing J. by herself when his siblings were present. Johnson testified that J. would sometimes become aggressive towards the other children. While mother focused on separating J. from his brother and sisters, one of the other children would run from the room, requiring DSS to intervene. DSS responded by staggering visitation so that mother would not need to manage all four children during the entire visit.

Johnson observed that "for the most part," mother's one-on-one visits with J. "went well." He testified that mother regularly would bring home-cooked meals for the children during these visits.

DSS denied mother's request for overnight visitation because the department was concerned for the safety of the children outside of supervised visitation.

### E. Termination Proceedings

In July 2016, DSS filed new foster care service plans that amended each child's permanency planning goal to adoption. The following month, the J&DR court entered permanency planning orders regarding each child as well as an order terminating mother's residual parental rights to J.

Mother appealed to the circuit court. At the conclusion of the evidence, mother renewed a motion to strike, in which she argued that she had substantially remedied all of the circumstances that led to her children's placement in foster care. She also argued that even if the court believed she could not manage all four of her children, the evidence did not prove that she could not parent any of them individually. And she argued that termination was not in J.'s best interests, in particular, because he was having difficulty adjusting to foster care.

The circuit court denied this motion to strike, approved the change in permanency planning orders, and terminated mother's parental rights in regard to each child. The court found that although mother had addressed many of DSS's requirements, she had not maintained

appropriate housing within twelve months of her children entering foster care. The court found that she never completed a domestic violence course or began the individual counseling recommended by Dr. Berry. The court also found that termination of mother's parental rights was in each child's best interests, noting both J.'s improvement since entering his second foster home as well as mother's failure to address her own mental and emotional issues.

Based on these findings, the court entered new permanency planning orders and orders terminating mother's parental rights to each of her children, pursuant to Code § 16.1-283(C)(2).[3]

## II. ANALYSIS

After a child is "placed in foster care as a result of a court commitment . . . or other voluntary relinquishment by the parent or parents," a court may terminate a parent's residual parental rights after making certain findings. Code § 16.1-283(C). First, the court must find that termination "is in the best interests of the child." Id. The court must also find either that the parent failed to maintain contact with and to provide or plan for the child's future for six months, see Code § 16.1-283(C)(1), or that the parent failed to remedy the circumstances that led to or required the continuation of the child's placement into foster care, see Code § 16.1-283(C)(2). Specifically, before parental rights may be terminated under subsection (C)(2), the court must find that:

> [t]he parent . . . without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement . . . .

Code § 16.1-283(C)(2). The court also must find that the relevant departments or agencies made "reasonable and appropriate efforts" to help the parent remedy those conditions, "tak[ing] into consideration the prior efforts of such agencies to rehabilitate the parent . . . prior to the

---

[3] The court also terminated Davis' parental rights to A., E., and I. Because J.'s father was not a party, his parental rights were not terminated in this proceeding.

placement of the child in foster care." Id. All of these findings must be "based upon clear and convincing evidence." Code § 16-1.283(C).

We traditionally have "acknowledge[d] that 'termination of . . . parental rights is a grave, drastic and irreversible action.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 400, 719 S.E.2d 329, 341 (2012) (quoting Helen W. v. Fairfax Cty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991)). Nevertheless, we also must "presume that the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's [or children's] best interests.'" Id. (alteration in original) (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). Consequently, "[w]here, as here, the court hears the evidence *ore tenus*, its finding is entitled to the same weight accorded to a jury verdict, and it will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986).

Mother assigns error to the circuit court's best interests finding regarding J. and to its finding that she failed to substantially remedy those conditions which led to his placement in foster care. We reject both arguments.

### A. Evidence Supported the Court's Best Interests Finding

Mother first contends that the circuit court erred in finding that terminating her residual parental rights was in J.'s best interests. Relying on our opinion in Fauquier County Department of Social Services v. Ridgeway, 59 Va. App. 185, 717 S.E.2d 811 (2011), mother argues that even if she was unable to raise all four of her children simultaneously, the court should not have found that that she would be unable to parent J. once the other children were removed.

In Ridgeway, we affirmed a circuit court's decision to terminate a mother's residual parental rights to only some of her children. Id. at 195, 717 S.E.2d at 816. There, the circuit

- 10 -

court found that the mother was unable to manage her two eldest children but also "found that 'there [was] not a sufficient factual basis' to conclude that she could not manage her two youngest children once the eldest children were removed." Id. at 194, 717 S.E.2d at 816. Consequently, the court terminated the mother's rights regarding only the eldest two children so she "could focus her attention on the younger children." Id. at 195, 717 S.E.2d at 816.

As mother acknowledged at oral argument, the procedural posture in Ridgeway compelled a different application of our standard of review. Because the mother in Ridgeway prevailed in the circuit court, we were required to view the evidence in the light most favorable to her. It does not necessarily follow that the exact same evidence would have compelled the reversal of a contrary ruling if we viewed the evidence in the light most favorable to DSS.

In any event, we must decide this case according to its specific facts, not by analogy to the facts in another case. We have noted previously that "'there is no simple, mechanical, "cut and dried" way' to apply the best interests of the child standard." Welch, 64 Va. App. at 48, 764 S.E.2d at 291 (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)). Rather, the best interests of a child must be determined "in light of the facts of each case." Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230, 288 S.E.2d 405, 407 (1982).

In this case, the circuit court's best interests determination relied heavily upon its finding that mother's own history of mental and emotional instability would impede her ability to address J.'s special needs. Both mother's mental health and J.'s developmental needs were appropriate factors for the court's consideration. See generally Harrison v. Tazewell Cty. Dep't of Soc. Servs., 42 Va. App. 149, 161, 590 S.E.2d 575, 581-82 (2004) (identifying the mental condition of both the child and parent as well as the child's needs as factors relevant to determining a child's best interests when terminating parental rights under Code § 16.1-283(C)(2)).

- 11 -

Moreover, the evidence supported the court's findings under these factors. Valentine testified that J. requires consistency in his environment to reduce the stressors that trigger his impulse to control or manipulate others. Stidsen testified, meanwhile, that introducing a new male romantic partner into the household so soon after Davis's incarceration would be emotionally disruptive to the children. And while both Dr. Reese and mother testified that changes to her medication had stabilized her emotions, both Johnson and Stidsen testified that she continued to exhibit aggressive, explosive behavior towards DSS staff after those changes were made. A reasonable fact finder could have inferred from this apparently contradictory testimony that mother's mental health had not stabilized.

We are satisfied that the court below "relied on appropriate factors and pointed to some evidence supporting its decision" regarding J.'s best interests. Welch, 64 Va. App. at 49, 764 S.E.2d at 292. We therefore cannot say that its finding was plainly wrong.

### B. Mother Failed to Substantially Remedy within Twelve Months

We also find no merit in mother's alternative argument that she substantially remedied the conditions leading to J.'s initial placement in foster care within twelve months. We previously have observed that termination under Code § 16.1-283(C) "hinge[s] not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005). The parent must make these changes "within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care." Code § 16.1-283(C)(2). A parent's failure "to make substantial progress . . . in

accordance with [her] obligations under and within the time limits or goals set forth in a foster care plan filed with the court . . . shall constitute prima facie evidence of this condition." Id.[4]

The record here is replete with reasonable changes that mother failed to make within twelve months to address the circumstances precipitating her children's placement in foster care. For instance, mother failed to demonstrate her ability to maintain a clean home fit for her children's habitation. Although her children first entered foster care in late July 2015, mother did not move into her new home until July 1, 2016. As DSS correctly observed at oral argument, it was impossible at that point for mother to demonstrate her ability to maintain the home's cleanliness for the three months, as required under the foster care service plans.

Likewise, the foster care service plans required mother to provide DSS with documentation certifying that she completed a domestic violence course. It appears from her own testimony, however, that she did not reach out to Empowerhouse until March 2016—at least seven months after the children entered foster care. She did not attend any open group meetings until July 2016. And the uncontradicted evidence showed that the course in which she eventually enrolled would not even have started until November 2016.

Most significantly, the record supports the circuit court's finding that mother failed to begin the recommended individual counseling to address mother's mental health within twelve months. The foster care service plans required mother to receive a psychological evaluation and to follow the clinician's recommendations. Although Dr. Berry recommended that mother participate in one-on-one counseling, mother's own testimony indicates that she did not have her first session until August 2016.

---

[4] While the Code excuses a parent's failure to make substantial progress if there is "good cause," mother does not argue good cause here. She argues only that the court should have found that the steps she took substantially addressed those conditions and that any steps she failed to take were irrelevant to the ultimate issue.

- 13 -

At oral argument, mother sought to minimize any delay in achieving these goals, arguing, for instance, that while "she didn't have appropriate housing during the entire period . . . she did at the time of trial." But what matters is whether she had completed these objectives within the time constraints imposed by Code § 16.1-283(C)(2). The twelve-month statutory limit is not trivial; it "protects the family unit and attendant rights of both parents and child, while assuring resolution of the parent/child relationship without interminable delay." Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995).

And while mother also argued that her other accomplishments show that she substantially remedied the circumstances underlying her children's initial foster placement, a reasonable fact finder could disagree. For instance, the court reasonably could have rejected Dr. Reese's testimony that mother's rebalanced medication addressed her mental and emotional instability in light of other witnesses' testimony about her continued explosive behavior.

A reasonable fact finder could have determined from this evidence that mother failed to make the reasonable changes required by the foster care service plans within twelve months of her children's foster placement. The fact finder also reasonably could have rejected her assertion that she substantially remedied the circumstances leading to their foster placement by other means. Thus, we find no error in the circuit court's factual determinations.[5]

---

[5] Mother also argued that other issues, such as her failure to obtain a driver's license within twelve months, were irrelevant under Code § 16.1-283(C)(2) because those issues had nothing to do with her children's initial placement in foster care. But as she acknowledged at oral argument, "the primary concerns" underlying her children's foster placement included her "mental health stability . . . unsafe conditions in the home . . . and the concern that there was domestic violence present in the relationship with Mr. Davis."

In light of our conclusion that a reasonable fact finder could have found that mother failed to remedy these specific concerns, we need not address the relevance of mother's failure to complete DSS's secondary objectives.

## III. CONCLUSION

The factual findings underlying the circuit court's order terminating mother's residual parental rights were neither plainly wrong nor without evidence to support them.  Thus, we affirm the circuit court's decision terminating mother's parental rights.

<u>Affirmed.</u>