COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Huff and Senior Judge Clements

UNPUBLISHED

MICHELLE HOBSON, S/K/A
 MICHELLE SONBERG-HOBSON

v.     Record No. 1980-18-1

CITY OF VIRGINIA BEACH DEPARTMENT
 OF HUMAN SERVICES

                                                          MEMORANDUM OPINION*
MICHELLE HOBSON, S/K/A                                    PER CURIAM
 MICHELLE SONBERG-HOBSON                                  JUNE 25, 2019

v.     Record No. 0260-19-1

CITY OF VIRGINIA BEACH DEPARTMENT
 OF HUMAN SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
H. Thomas Padrick, Jr., Judge

(Peter Imbrogno; Peter Imbrogno and Associates, P.C., on brief), for
appellant. Appellant submitting on brief.

(Mark D. Stiles, City Attorney; Christopher Boynton, Deputy City
Attorney; Rachel Evans, Associate City Attorney; Carla Kithcart,
Guardian *ad litem* for the minor child, on brief), for appellee.
Appellee and Guardian *ad litem* submitting on brief.


Michelle Hobson (mother) appeals the orders terminating her parental rights and approving

the foster care goal of adoption. Mother argues that the circuit court erred in terminating her

parental rights because (1) a family member had petitioned for custody; (2) a family member was

"ready, able and capable of caring for the child;" (3) a family member had "regular and consistent

contact with the child;" (4) a family member had "positive, continuous" interaction with the child

_____

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

and could provide a safe, permanent, and "appropriate" home for the child; (5) a family member was "willing and capable of caring for the child;" (6) it was in the child's best interests "to maintain the relationship between the child and the family [member];" (7) it was not in the child's best interests to terminate mother's parental rights under Code § 16.1-283(C)(2); and (8) it was not in the child's best interests to terminate mother's parental rights under Code § 16.1-283(E) and the City of Virginia Beach Department of Human Services (the Department) did not prove that mother's parental rights had been terminated previously for a sibling of the child. Mother also argues that the circuit court erred in changing the foster care goal to adoption. Upon reviewing the record and briefs of the parties, we conclude that the circuit court did not err. Accordingly, we affirm the decision of the circuit court.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168 (2014)).

Mother has eight children; the youngest child is the subject of this appeal. Mother has a history of mental illness and substance abuse. In 2006, the Department first became involved with mother and her three oldest children. There were findings of physical neglect, inadequate shelter, and lack of supervision. The City of Virginia Beach Juvenile and Domestic Relations District Court (the JDR court) placed the children with a maternal aunt and uncle. Without informing anyone,

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

mother moved to Ohio with her boyfriend.  After completing the required services, mother received custody of her three oldest children.

Mother gave birth to four children while she lived in Ohio.  The children entered foster care in Ohio due to reports of physical neglect, inadequate shelter, and inadequate supervision.  Two paternal relatives received custody of the six oldest children.  Mother's parental rights to her seventh child were terminated in 2015.

Mother's eighth child was born in 2015.  The Department became involved shortly after the child's birth due to concerns that mother did not have custody of her other seven children.  In July 2015, the JDR court entered preliminary child protective orders and adjudicated that the child was at risk of being abused or neglected.  The JDR court placed the child with the paternal grandparents and ordered that mother could have supervised visitation.  Evan Sonberg (father) was permitted to visit with the child at the discretion of the paternal grandparents.  The JDR court ordered mother to submit to a hair follicle test, undergo a parental capacity evaluation, and take parenting classes, but mother failed to cooperate and comply with the services.  On November 4, 2015, the JDR court awarded sole legal and physical custody of the child to father and ordered that mother have no contact with the child until further court order.

On December 8, 2016, the police were dispatched to father's home.  The police knocked on the door for approximately ten minutes, without a response.  The police saw that the child was in the home, so they knocked down the door and awakened mother and father.  The child was in her crib crying and had a soiled diaper.  The police also discovered one hundred marijuana plants and methamphetamine in the home.  The police arrested father for two counts of possession of a Schedule I/II controlled substance with the intent to distribute.[2]

---

[2] Father's criminal matters had not been resolved at the time of the circuit court hearing.

Father agreed to a safety plan, placing the child with the paternal grandfather.[3] The paternal grandfather told the Department that he did not agree with the order prohibiting mother from having contact with the child because he believed that the child should have contact with mother.

The JDR court entered an emergency removal order on January 18, 2017, and a preliminary removal order on January 24, 2017. On February 23, 2017, the JDR court adjudicated that the child was at risk of being abused or neglected. On March 21, 2017, the JDR court entered the dispositional order. On the same date, the JDR court also amended the 2015 child protective order, and held that mother's contact with the child was at the Department's discretion.

The paternal grandfather had filed a petition for custody of the child. The Department coordinated weekly visitation between the child and the paternal grandfather and completed a home study of the paternal grandfather in April 2017. The Department expressed concern about placing the child with the paternal grandfather because of his age, health, and lack of support system. The Department also was doubtful that the paternal grandfather would honor the no contact order between mother and the child, and it was concerned that the paternal grandfather would not protect the child if father came to the house. On April 26, 2017, after the home study was completed, the JDR court dismissed the paternal grandfather's petition for custody of the child because of the concerns expressed in the report. The paternal grandfather appealed the custody decision to the circuit court.

The maternal grandmother also filed a petition for custody of the child. As it had with the paternal grandfather, the Department coordinated supervised visitation with the maternal grandmother and arranged for a home study of the maternal grandmother. After the home study was completed, the Department did not recommend placing the child with the maternal

---

[3] The paternal grandmother passed away in December 2016, before the child was placed with the paternal grandfather.

- 4 -

grandmother because she had had substance abuse issues and a 2016 conviction for driving under the influence. On April 23, 2018, the JDR court dismissed the maternal grandmother's petition for custody.

The Department offered numerous services to mother and father while the child was in foster care. The Department referred mother to Project Link, where she could receive case management services; however, mother did not attend the orientation. The Department also required mother to undergo a substance abuse assessment and parenting capacity evaluation and participate in individual therapy, group therapy, medication management, and parenting classes. Mother did not comply with any of these services and was "oppositional" about them.

The Department required father to refrain from all criminal activities. The Department also required father to undergo a substance abuse assessment and a parental capacity evaluation and to participate in co-parenting classes, individual therapy, a medical evaluation, and the Fathers in Training group. Although father attended three out of fifteen classes for the Fathers in Training group, he did not comply with the remaining requirements. In addition to his drug charges in Virginia Beach, father was charged in Spotsylvania County with two counts of identity theft and two counts of stealing a credit card number via computer; however, the Spotsylvania charges were *nolle prosequied* in February 2018. The Department would not consider reunification, however, until all of his criminal matters were resolved.

In addition, mother and father had to submit to a hair follicle test before they were allowed to visit with the child. In July 2017, mother and father submitted hair follicle tests that appeared to have been falsified. When the Department confronted them about the tests, the parents denied falsifying the documents. The Department, however, confirmed that the company purporting to have conducted the tests did not, in fact, complete any hair follicle tests for the month reported by the parents. In addition, the tests submitted by the parents did not contain a chain of custody, nor

did they show the cutoff levels, both of which were typically included with a hair follicle test. The parents never visited with the child while she was in foster care.

On January 26, 2018, the Department petitioned for the termination of mother's and father's parental rights. On February 7, 2018, at the request of the Department, the JDR court dismissed without prejudice the Department's petitions to terminate mother's and father's parental rights. On June 4, 2018, the JDR court approved the foster care goals of adoption and relative placement and ordered that the parents were to have no contact with the child. The parties appealed the JDR court's rulings to the circuit court.

On October 9, 2018, the parties appeared before the circuit court on the paternal grandfather's petition for custody, the termination of mother's and father's parental rights, and the foster care goal of adoption. The Department proffered the circumstances surrounding the removal of mother's other seven children and offered into evidence a copy of the Ohio court order terminating mother's parental rights to her seventh child. A social worker testified that mother and father still had not completed any of the Department's required services.

Furthermore, the Department informed the circuit court that the child was "thriving" in foster care and had "made a lot of improvement." The child had been placed with the same foster family since she entered foster care, and the foster mother testified that she and her husband were willing to adopt the child. When the child entered foster care, she had vision and hearing problems, as well as "global developmental delays." While in foster care, the child had tubes placed in her ears and started wearing glasses. A hearing test in February 2018 revealed that the child did not have any hearing loss.

Once in foster care, the child received physical therapy, speech therapy, and occupational therapy. The child initially could not speak or make sounds, but with the help of her speech therapist and foster mother, the child learned sign language and started to speak sounds and words.

The child's speech therapist explained that the child was diagnosed with apraxia, which meant that she had difficulty putting sounds and words together and processing what was being said to her. The speech therapist anticipated that the child would need therapy for years. In occupational therapy, the child worked on her sensory processing issues, poor core strength, and low muscle tone. The occupational therapist indicated that the child had made "very significant advances in her motor skills, her ability to be independent, [and] sit and attend." The child has multiple therapy and doctor appointments each week.

In addition, the Department presented evidence regarding its efforts at relative placement. The paternal grandfather regularly visited with the child. The Department, however, was concerned about his supervision of the child because during some visits, he fell asleep. During another visit, the paternal grandfather did not notice that the child had placed chalk in her mouth, and the social worker had to remove it. During visits, the paternal grandfather appeared slow-moving and had to rest frequently. In July 2018, the paternal grandfather continued to express to the Department his dismay that the parents could not have contact with the child. The Department remained concerned about the paternal grandfather's ability to protect the child.

The paternal grandfather, who was seventy-five years old at the time, testified that he wanted to care for the child. The paternal grandfather took medication for atrial fibrillation, diabetes, and blood pressure, all of which were under control. He also used a CPAP machine for his sleep apnea and was tested regularly for "minimum" kidney issues. The paternal grandfather testified that he would honor a no contact order between the child and the parents, but if he had custody without any court restrictions, then he would "provide more contact" between the child and the parents. He also stated that he would take the child to all of her appointments.

Neither mother nor father testified. At the conclusion of the evidence and arguments, the circuit court denied the paternal grandfather's petition for custody. The circuit court found that the

Department had presented clear and convincing evidence to support the termination of mother's parental rights under Code § 16.1-283(C)(2) and (E) and that termination of mother's parental rights was in the best interest of the child.[4]  The circuit court also approved the foster care goal of adoption.  This appeal followed.

## ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'"  Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)).  "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it."  Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

### *Relative placement*

Mother argues that the circuit court erred by terminating her parental rights instead of placing the child with the paternal grandfather.  She asserts that the paternal grandfather was "ready, able and capable" of caring for the child and had had regular contact with the child.  Mother emphasizes that the paternal grandfather had been involved in the child's life since she was born.  He had a suitable home and was in good health for his age.  He also had testified that he would ensure that the child continued with her therapy and that he would honor any no contact order the court issued.  Mother further contends that it was in the child's best interests to be placed with the paternal grandfather.

---

[4] The circuit court also terminated father's parental rights under Code § 16.1-283(C)(2), and father appealed that ruling to this Court.  See Sonberg v. City of Virginia Beach Dep't of Human Servs., Record No. 1655-18-1.

Before terminating a parent's rights, "the court shall give a consideration to granting custody to relatives of the child, including grandparents." Code § 16.1-283(A). "This Court has held that this provision obligates [the Department] 'to produce sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison to other placement options.'" Castillo, 68 Va. App. at 567 (quoting Brown v. Spotsylvania Dep't of Soc. Servs., 43 Va. App. 205, 217 (2004)). Accord Hawthorne v. Smyth Cty. Dep't of Soc. Servs., 33 Va. App. 130, 136 (2000); Logan, 13 Va. App. at 131. We do not disturb the circuit court's ruling that there were no suitable relative placements because "this Court defers to a lower court's judgment based on evidence heard *ore tenus* unless plainly wrong or without support." Castillo, 68 Va. App. at 568.

The Department presented evidence of its investigation into placing the child with the paternal grandfather, the maternal grandmother, and other possible relatives. The Department submitted its home assessment of the paternal grandfather, which included the Department's concerns about placing the child with the paternal grandfather, especially his health and commitment to no contact with mother and father.

The paternal grandfather had filed a petition for custody and testified at the circuit court hearing. He testified about his age, his health, and his home. He expressed his desire to care for the child, but also his belief that mother and father should have contact with her. The paternal grandfather also testified that he was not familiar with the child's therapies. He admitted that he fell asleep during some of the visits and explained, "Sometimes I just sit there and close my eyes because my eyes get tired . . . ." He also acknowledged that during one of the visits, the child had placed chalk in her mouth and he had not realized it.

Before she entered foster care, the child had lived with the paternal grandfather and father. After she entered foster care, the Department discovered that the child could not speak,

and it was uncertain whether she could hear. Once in foster care, the child received eyeglasses, had tubes placed in her ears, and participated in speech therapy, occupational therapy, and physical therapy. The foster mother and the child's therapists testified about the child's progress, but they also discussed her future needs. The child was three years old at the time of the circuit court hearing and had been in the same foster care placement since she was eighteen months old. The foster parents were willing to adopt her. The foster mother further testified that she would be willing "to continue some sort of relationship" between the child and the paternal grandfather as long as it was in the child's best interests.

The circuit court considered the totality of the evidence and held that it was not in the child's best interest to grant custody of the child to the paternal grandfather. The circuit court found that the child had "significant physical and mental issues." The paternal grandfather was seventy-five years old and "in pretty good shape," but "not in the best condition." The circuit court expressed concern about "what kind of condition he's going to be in when he's 80, keeping up with a three-year-old." The circuit court acknowledged that the paternal grandfather had visited regularly, had "done everything he[] [was] supposed to do," and had "tried to create an environment that [was] good for the child." Although the paternal grandfather "would be a positive influence" in the child's life, the circuit court found that "it would be really difficult for the grandfather" to raise the child. The circuit court concluded that the child needed a "permanent home," which the paternal grandfather would be unable to provide in the long term.

The circuit court clearly considered relative placement before it terminated mother's parental rights. Contrary to mother's arguments, there is credible evidence in the record that supports the circuit court's decision not to place the child with the paternal grandfather.

*Termination of parental rights*

Mother argues that the circuit court erred in terminating her parental rights under Code § 16.1-283(C)(2) and (E) because termination of her parental rights was not in the best interest of the child.

Code § 16.1-283(C)(2) states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(E)(i) provides that a parent's parental rights may be terminated "if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that (i) the residual parental rights of the parent regarding a sibling of the child have previously been involuntarily terminated . . . ."

"'[T]here is no simple, mechanical, cut and dried way' to apply the best interests of the child standard." Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 48 (2014) (quoting Peple v. Peple, 5 Va. App. 414, 422 (1988)). "Instead, 'the question must be resolved . . . in light of the facts of each case.'" Id. (quoting Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230 (1982)).

The record demonstrates that mother has seven other children, but she does not have custody of any of them. Her parental rights were terminated to one of her children in Ohio. Mother did not comply with any of the Department's requirements with respect to the child, who is the subject of this appeal. She had not had any contact with the child the entire time the child was in foster care. In fact, mother had never had custody of the child.

In addition, the child had special needs that went unaddressed until she entered foster care. The foster parents and therapists worked with the child, and the child showed significant improvements. The child had been with the same foster family since she entered foster care, and the foster parents expressed a desire to adopt her.

Considering the totality of the circumstances, the circuit court did not err in finding that it was in the best interests of the child to terminate mother's parental rights under Code § 16.1-283(C)(2) and (E).[5]

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

Affirmed.

---

[5] With respect to mother's challenge of the foster care goal of adoption, "[o]ur decision to affirm the termination order necessarily subsumes this aspect of [her] appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265 n.3 (2005).