COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges O'Brien, Malveaux and Senior Judge Frank

CHARLES KENNY HUFF, JR.

v.       Record No. 0843-20-2

MEMORANDUM OPINION*
PER CURIAM
FEBRUARY 2, 2021

CITY OF FREDERICKSBURG
  DEPARTMENT OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
Gordon F. Willis, Judge

(Gary D. Godman; Williams Stone Carpenter Buczek, PC, on brief),
for appellant. Appellant submitting on brief.

(Robin N. Krueger; Edith M. Min, Guardian *ad litem* for the minor
child, on brief), for appellee. Appellee and Guardian *ad litem*
submitting on brief.


Charles Kenny Huff, Jr. (father) appeals the circuit court's orders terminating his parental

rights and approving the foster care goal of adoption. Father argues that the circuit court "erred in

refusing to continue the case due to the COVID-19 pandemic." Father further asserts that the City

of Fredericksburg Department of Social Services (the Department) "did not perform an adequate

investigation of [father's] fictive kin for possible relative placement" and that it was not in the

child's best interests to terminate father's parental rights. Upon reviewing the record and briefs of

the parties, we conclude that the circuit court did not err. Accordingly, we affirm the decision of

the circuit court.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cnty. Dep't of Hum. Servs., 63 Va. App. 157, 168 (2014)).

Father and Amy Harris (mother) are the biological parents to the child who is the subject of this appeal. On June 15, 2019, a couple of weeks after the child's birth, the Department received a report that the child was failing to gain weight. At the time, the child was living with mother in Fredericksburg, and father was living in Lynchburg. The Department provided mother and the child with ongoing services.

On July 8, 2019, the Department removed the child from mother's care because mother had not sought medical care for the child, who had a "very bad rash" that was diagnosed as scabies. The Department contacted father, who indicated that he was willing to care for the child. The Department informed father that it would need to see his home. Father became "evasive" and stated that he was "unable to get home."

The Fredericksburg Juvenile and Domestic Relations District Court (the JDR court) entered a preliminary removal order, and the child entered foster care. The JDR court subsequently adjudicated that the child was abused or neglected and entered a dispositional order.

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

The Department conducted a CLEAR search for possible paternal and maternal relatives and sent letters to those individuals to see if they were interested in acting as a placement for the child.[2] The Department received no responses from father's relatives, except one letter was returned and marked, "Return to Sender."

The Department met with father and informed him that if he wished to have custody of the child, then he needed to obtain and maintain safe, stable, and appropriate housing and provide a copy of the lease to the Department. Father had to develop a budget and demonstrate that he could provide financially for the child. The Department required father to participate in visitation, develop a childcare plan for the child, and create a transportation plan for the child's regular and emergency needs. Father also had to complete a parent competency and psychological evaluation and follow all recommendations. In addition, father had to complete background checks and maintain contact with the Department.

In the fall of 2019, father was completing some of the Department's requests. He reportedly resided at an extended stay hotel for several months. He was employed and had a vehicle. Father completed the necessary background checks and maintained contact with the Department.[3] Father also completed the parenting assessment and psychological evaluation. Father started visiting the child on a weekly basis, although he missed a visit in October 2019 due to his incarceration.

In December 2019, father left the extended stay hotel where he resided and was homeless until early 2020, when he started living with his new girlfriend and her mother. In January 2020, father's vehicle broke down, and he told the Department that "it was going to the junk yard."

---

[2] The Department runs searches for relatives on CLEAR, "a people finding database."

[3] In early December 2019, father angrily left a meeting with the Department after being confronted with the veracity of his reports regarding his housing and employment.

The Department reduced father's visitation to every other week because of father's "instability and limited progress." The Department became concerned with father's parenting skills after hearing him claim that the child was trying to walk at five months of age and leaving the child unattended on a couch during visitations. The Department tried to obtain funding for a parent coach for father, but he did not appear at the meeting or the rescheduled meeting. Father's last visit with the child was on February 24, 2020. On March 9, 2020, father was arrested and incarcerated on a charge of grand larceny.

On May 12, 2020, the JDR court terminated father's parental rights and approved the foster care goal of adoption.[4] Father appealed the JDR court's rulings to the circuit court.

On June 23, 2020, father moved for a continuance of the circuit court termination hearing because he could not be transported to the circuit court due to a preliminary hearing being held in Appomattox General District Court the following day. He also had scheduled a criminal trial for September 14, 2020 in Lynchburg Circuit Court. Father requested that the circuit court reschedule his termination hearing for a date after his criminal matters had been resolved. The Department objected to the hearing being scheduled after father's September court date. The circuit court granted father's motion for a continuance but scheduled the termination hearing for July 9, 2020.

The parties appeared before the circuit court on July 9, 2020. Father renewed his motion for a continuance. The circuit court denied father's motion to continue the matter to an indefinite date because it was unknown as to when his criminal matters would be concluded and that it was not in the child's best interest "to be just left in limbo for an indefinite period of time."

---

[4] Mother signed a voluntary entrustment agreement, and her parental rights were terminated.

At the time of the circuit court hearing, the child was one year old. The Department presented evidence that the child was doing well in foster care. His skin condition had cleared, and he was no longer malnourished.

At the conclusion of the Department's evidence, father moved to strike, which the circuit court denied. Father testified about his employment and housing situations after the child entered foster care. Father had worked several jobs through a temp agency, and he owned his own business. When the child first entered foster care, father was renting a room in a house with his girlfriend at the time, and then, they moved to an extended stay hotel. Then, father testified that he became "sort of like homeless." Father started dating a different woman in January 2020, and he lived with her and her mother until he was arrested in March 2020.[5] Father testified that his girlfriend was willing to care for the child while he was incarcerated, and he also suggested that he had a possible relative who was willing to care for the child. Although he claimed to have provided the Department with the person's information, he could not recall her name during the trial and did not exactly know their relationship to one another, other than she was "somebody on [his] mom's side of the family." Father acknowledged that the person had not come to court.

Father admitted that he had been convicted of a felony at the end of July 2019, after the child entered foster care. Then, he was arrested for new offenses in October 2019 and held in jail overnight. In January 2020, he was arrested for driving on a revoked license, third offense in ten years, but father testified that this charge was "a misunderstanding" because he had a temporary license to drive to and from work, which he was doing at the time of his arrest. Finally, in March 2020, he was arrested and remained incarcerated at the time of the circuit court hearing. Father

---

[5] Father's girlfriend was married, but her husband was incarcerated at the time.

anticipated being released from incarceration in September 2020. Father expressed his desire to be with the child.

Father's girlfriend confirmed that she was willing to care for the child while father was incarcerated or when he was at work after his release. She intended for father, not her, to have custody of the child, but she was willing for the child to live with her until father was released from incarceration. She acknowledged that she had not met the child, and she relied on her family for financial support.

On rebuttal, the Department admitted that father had provided a note with an address, two telephone numbers, and a name of a person, who father said, "may be [a] cousin on mom's side as foster child." The person never contacted the Department, and the social worker was unaware of whether the Department tried to contact her. The person was not identified during the Department's search of possible relatives for placement.

After hearing the evidence and arguments, the circuit court terminated father's parental rights under Code § 16.1-283(C)(2) and approved the foster care goal of adoption. This appeal followed.

ANALYSIS

*Motion for Continuance*

Father argues that the circuit court erred in refusing to continue the case "due to the COVID-19 pandemic." He contends the circuit court's refusal to continue the termination hearing until after his criminal matters were resolved was "an abuse of discretion that resulted in prejudice" to him. He notes that he was arrested in March 2020 and that his criminal matters had been delayed "because of the virus," which affected his ability to "participate in the remainder of the foster care plan items."

"The decision of whether to grant a continuance is committed to the discretion of the circuit court. We will reverse 'a circuit court's ruling on a motion for a continuance . . . only upon a showing of abuse of discretion and resulting prejudice to the movant.'" Shah v. Shah, 70 Va. App. 588, 593 (2019) (quoting Haugen v. Shenandoah Valley Dep't of Soc. Servs., 274 Va. 27, 34 (2007)).

On March 9, 2020, father was arrested and remained incarcerated. On June 23, 2020, after appealing the JDR court's ruling terminating his parental rights, father moved for a continuance in the circuit court because he was unable to be transported to the termination hearing. Father had criminal matters pending in Appomattox County and the City of Lynchburg. Father explained to the circuit court that his criminal matters in Lynchburg had been continued twice "for reasons outside of his control," but presumably for "the coronavirus scheduling." Father requested that the circuit court reschedule his termination hearing for a date after his criminal matters had been resolved. The circuit court granted father's motion for a continuance and confirmed that father's continuance request was because of his incarceration, not COVID-19. The circuit court denied father's request to continue the termination hearing for a date after the resolution of his criminal matters, and it scheduled the termination hearing for July 9, 2020.

On July 9, 2020, father renewed his motion for a continuance and again requested that the termination hearing be held after his criminal matters were resolved. He informed the circuit court that in Appomattox County, he faced a grand jury in September, and in Lynchburg, he had a trial scheduled for September. Father conceded that he did not know if his criminal matters would be resolved in September 2020. The circuit court denied father's motion to continue the matter to an indefinite date because it was unknown as to when his criminal matters would be concluded and it was not in the child's best interest "to be just left in limbo for an indefinite

- 7 -

period of time." The circuit court proceeded to hear evidence and argument on July 9, 2020, over father's objection.

Father contends that he had not been "given the chance to show substantial progress" with the foster care requirements because he had been incarcerated and unable to have his criminal matters heard due to the COVID-19 pandemic. On March 16, 2020, in response to the COVID-19 global pandemic, the Chief Justice declared a judicial emergency at the request of the Governor, as authorized by Code § 17.1-330(A), and that order included the following provision:

> Continue all civil, traffic and criminal matters, including jury trials, subject to a defendant's right to a speedy trial, with the exception of emergency matters, including but not limited to, quarantine or isolation matters, arraignments, bail reviews, protective order cases, emergency child custody or protection cases, and civil commitment hearings. Judges may exercise their discretion with regard to proceeding with ongoing jury trials, and in cases where the defendant is incarcerated.

By orders of March 27, 2020, April 22, 2020, May 6, 2020, June 1, 2020, and June 22, 2020 (collectively "the judicial emergency orders"), the Chief Justice extended the period of judicial emergency. The June 22, 2020 judicial emergency order, in effect at the time father first requested his continuance, provided, "Notwithstanding the ongoing preference for conducting business by video conferencing or telephone, all courts may hear in-person non-emergency matters and non-jury cases if they determine it is safe to do so . . . ." The June 22, 2020 judicial emergency order further provided, "Continuances and excuses for failure to appear shall be liberally granted for any cause resulting from the impact of the ongoing COVID-19 crisis."

The circuit court confirmed with father that his request for a continuance in the termination hearing was not due to COVID-19, but rather because he was incarcerated. The circuit court further verified that father did not know when his criminal matters would be resolved. Father acknowledged that in appeals of termination of parental rights matters, Code § 16.1-296(D) required a circuit court to "hold a hearing on the merits of the case within 90 days

of the perfecting of the appeal." His request for a continuance until after September 2020 placed him outside of the ninety-day window.

Contrary to father's arguments, the circuit court did not err in denying his motion for a continuance. The circuit court considered Code § 16.1-296(D) and the child's best interests, finding that "it's not good for the child's situation and circumstances to be just left in limbo for an indefinite period of time." "When considering termination of parental rights, 'the paramount consideration of a trial court is the child's best interests.'" King v. King George Dep't of Soc. Servs., 69 Va. App. 206, 211 (2018) (quoting Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011)). The circuit court did not err in denying father's request for an indefinite continuance.

*Relative placement*

Father argues that the Department "did not perform an adequate investigation of [his] fictive kin for possible relative placement." Father contends the circuit court "was plainly wrong in finding the [Department's] efforts to seek relatives to be adequate." He asserts that the Department did not investigate a possible relative on his mother's side, even though he had provided the Department with her name, address, and two telephone numbers.

Before terminating a parent's rights, "the court shall give a consideration to granting custody to a person with a legitimate interest." Code § 16.1-283(A). "This Court has interpreted this provision to require agency consideration of all '"reasonable options for placement with immediate relatives" as a prerequisite to a parental termination decision.'"[6] Pilenza v. Nelson Cnty. Dep't of Soc. Servs., 71 Va. App. 650, 654 (2020) (quoting Bagley v. City of Richmond Dep't of Soc. Servs., 59 Va. App. 522, 524 (2012)). Moreover, "this provision obligates [the

---

[6] Code § 16.1-283(A) was amended in 2019; in Pilenza, the Court interpreted the previous version of Code § 16.1-283(A), which was in effect at the time of the trial court's ruling. Pilenza v. Nelson Cnty. Dep't of Soc. Servs., 71 Va. App. 650, 654 (2020).

Department] 'to produce sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison to other placement options.'" Castillo v. Loudoun Cnty. Dep't of Fam. Servs., 68 Va. App. 547, 567 (2018) (quoting Brown v. Spotsylvania Dep't of Soc. Servs., 43 Va. App. 205, 217 (2004)). "Although mandatory, this obligation is limited." Id. "We do not suggest that the Department has a duty in every case to investigate the home of every relative of the children, however remote, as a potential placement." Id. (quoting Sauer v. Franklin Cnty. Dep't of Soc. Servs., 18 Va. App. 769, 771 (1994)).

Father testified that he had provided a note to the Department with a name, address, and phone number of his "mom's sister."[7] When questioned further, father admitted that he was not sure how the person was related to him or his mother but thought she was "somebody on [his] mom's side of the family." Father could not recall her name or where she lived, and he admitted that he had not asked the person to come to any of the court hearings.

The Department confirmed that father gave the social worker a note with a name, address, and two phone numbers, and the note said that the person "may be [a] cousin on mom's side as foster child." The person never contacted the Department. The person was not identified as a possible relative in the CLEAR search, and father never talked about this person after giving the Department the note. The social worker was unaware if "anyone from the Department" had tried to contact the person.

The circuit court found that the Department had conducted a CLEAR search and considered relatives "on an ongoing basis." With regard to father's note, the circuit court found that father was not "even quite sure of the relationship of this individual." When asked by the

---

[7] The note was not admitted into evidence.

circuit court, father's counsel conceded that "sitting here today, we don't even know if this person, whoever they are, what the relationship is and if they really truly exist."

There is no evidence to suggest that the person named in the note was a "person with a legitimate interest" as provided in Code § 16.1-283(A); therefore, the circuit court did not err in finding that the Department had no duty to investigate the person as a possible placement. "Because this Court defers to a lower court's judgment based on evidence heard *ore tenus* unless plainly wrong or without support, it does not disturb the circuit court's ruling that no relatives were suitable placements." Castillo, 68 Va. App. at 568 (internal citation omitted).

*Termination of Parental Rights*

Father argues that the termination of his parental rights was not in the child's best interests. "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Id. at 558 (quoting Logan v. Fairfax Cnty. Dep't of Hum. Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Ridgeway, 59 Va. App. at 190 (quoting Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

Appellant does not contest that "he was unable to remedy the conditions leading to the child's placement in foster care before the twelve-month deadline." Rather, appellant argues that the circuit court erred in finding that the termination of his parental rights was in the child's best interests. He emphasizes that he maintained a relationship with the child and attended most of the visits. His girlfriend provided photographs to the circuit court of her home and their accommodations for the child. He contends that "[d]espite the issues [he] was unable to remedy

that were of concern to the [circuit] court, his blossoming relationship with [the child] was a promising sign of development of the parent-child relationship."

The circuit court terminated father's parental rights under Code § 16.1-283(C)(2), which states that a court may terminate parental rights if it finds that termination is in the best interests of the child and that:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

As discussed above, in matters involving the termination of parental rights, a court's "paramount consideration" is the child's best interests. King, 69 Va. App. at 211 (quoting Ridgeway, 59 Va. App. at 190). "'[T]here is no simple, mechanical, cut and dried way' to apply the best interests of the child standard." Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 48 (2014) (quoting Peple v. Peple, 5 Va. App. 414, 422 (1988)). "Instead, 'the question must be resolved . . . in light of the facts of each case.'" Id. (quoting Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230 (1982)).

Here, the circuit court recognized that father loved the child "very much." The circuit court, however, found that "everything [was] in flux in [father's] life" and that his life was "very unstable." The circuit court noted that his relationship with his girlfriend was "very tenuous" and his housing situation during the child's lifetime had "been all over the map." Father had been unable to demonstrate that he could meet the child's needs. The circuit court held that the child "deserve[d] to have stability . . . [and] a chance to maximize his potential in life."

The child had been in foster care for all but a few weeks of his life. Father admittedly was not in a position to care for the child at the time of the circuit court hearing. "It is clearly not

- 12 -

in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cnty. Dep't of Hum. Servs., 62 Va. App. 296, 322 (2013) (quoting Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).  Based on the totality of the evidence, the circuit court did not err in finding that it was in the child's best interests to terminate father's parental rights.

## CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

Affirmed.