COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Athey and Bernhard

DEBORAH A. CAMPBELL

v.      Record No. 0904-25-3

NELSON COUNTY DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION*
PER CURIAM
NOVEMBER 25, 2025

FROM THE CIRCUIT COURT OF NELSON COUNTY
Michael R. Doucette, Judge

(Robert R. Feagans, Jr.; Robert R Feagans Jr PLLC, on brief), for
appellant.  Appellant submitting on brief.

(P. Scott De Bruin; P. Scott De Bruin, P.C., on brief), for appellee.

(Bryan E. Klein, Guardian ad litem for the minor children;
Crusader Law, PLLC, on brief), for appellee. Guardian ad litem
submitting on brief.


Deborah A. Campbell ("mother") appeals from an order of the Circuit Court of Nelson

County ("circuit court") terminating her parental rights to her minor children pursuant to Code

§ 16.1-283(B) and (C).  On appeal, mother assigns error to the circuit court: 1) for finding the

evidence sufficient to terminate her parental rights pursuant to Code § 16.1-283(C)(2); 2) for

finding that termination was in the best interest of the children; 3) for failing to consider lesser

available alternatives instead of terminating her parental rights; 4) for relying on unadjudicated

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

allegations of abuse and neglect against her in other jurisdictions; and 5) for denying her motion

to transfer venue. Finding no error, we affirm the circuit court's judgment.[1]

## I. BACKGROUND[2]

Mother is the biological parent of four minor children: D.C, W.C., L.C., and Z.C.[3] In

February of 2023, D.C., W.C., and Z.C. were 15, 12, and 8 years old, respectively.[4] Mother and

children lived in her grandfather's home but later moved to Shipman, Virginia.

In February of 2023, the family came to the attention of the Nelson County Department

of Social Services ("Department"). W.C. had escaped from their home in Shipman and reported

to a neighbor that her mother had "lost her mind" and was physically abusing the children. The

neighbor contacted the Nelson County Sheriff's Office who removed the remaining children

from the home until the Department could complete a family assessment. The remaining

children were first placed in the home of a relative. The Nelson County Juvenile and Domestic

Relations District Court ("JDR court") subsequently determined that they were children in need

of services and placed them into foster care. While W.C. and Z.C. were placed in the same

foster home, D.C. was placed in a different foster home.

---

[1] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the appeal is wholly without merit." *See* Code § 17.1-403(ii)(a); Rule 5A:27(a).

[2] "On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)). "To the extent that this opinion discusses facts found in sealed documents in the record, we unseal only those facts." *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023).

[3] We use initials instead of the children's full names to protect their privacy.

[4] The record indicates that L.C. died in July of 2020.

Underlying their removal was a long history of enduring mother's abuse. The children recalled that mother abused and neglected them for much of their lives. The children reported that mother "beat[], punche[d], and choke[d] them." They further reported that she "would grab anything she could get her hands on" to beat them, including a belt buckle with "spikes," a wooden paddle, shoes, a frying pan, a "statuette," and a curtain rod. They further recalled that she would pull their hair and that on one occasion she "yank[ed] [Z.C.] by the hair, throwing him into things in the house." They described how mother had "beat[en] [W.C.] with [a] laptop computer until a screw fell out" resulting in mother "knock[ing] her to the floor." They further reported that mother then "stomped on [W.C.'s] stomach with boots on," which made W.C. "bleed from her vagina." They reported that mother even threatened them with a screwdriver, and "the kids believed she had an intent to kill them with [it]." In addition to physical abuse, mother constantly verbally berated her children. Mother called both D.C. and W.C. a "slut," "hoe," and "whore." She also "threatened to kill [Z.C.]," "screamed in his face," and called Z.C. "dumb" and "stupid" "many times." Mother also "treated [W.C.] like she was worthless and called her demeaning names."

Mother also encouraged the children to ingest illegal drugs and to commit crimes. She "had vapes all around the house," and D.C. and W.C. "used them so much they were addicted." She also "let the kids drink alcohol" and "made them Long Island [I]ce [T]ea drinks when she had parties at the house." In addition to encouraging the children to drink alcohol, mother "encouraged [the children] to steal." She even "taught [the children] how to make a scene in the grocery store so that she could steal while they distracted everyone." This scenario "happened all the time." While at home, mother would often be "drunk" and "passed out a lot." In addition, "[s]he had men in and out of the house, also drunk." Mother's parties would often lead

to sexual activity, wherein the children heard mother having sex with these men, with one child recounting that "[i]t was a revolving door of men."

Indeed, mother's attitude concerning sex around her children was alarming. She would have men over that gave the children "creepy vibes," and these men "looked at them in a sexual way." Mother also "told [D.C.] about [mother's boyfriend] doing anal sex on her." This form of abuse and neglect ultimately culminated in mother being complicit in D.C. and W.C. being raped by men she would invite into her home. For example, W.C. reported that "a male babysitter, a friend of [mother], raped [W.C.] and [D.C.] multiple times." W.C. recounted that she "begged [mother] to not leave him to babysit" but "[mother] didn't listen and left him there." Even after "[D.C.] told [mother] about the sexual abuse, [mother] didn't believe her," and "left [the babysitter] with the kids often."

The children reacted to mother's abuse in several ways. For example, "[D.C.] and [W.C.] ran away multiple times," but they returned each time. Mother usually ignored their disappearances or responded with hostility. The children also reacted to mother's abuse with suicidal ideation or by attempting suicide. When the children espoused suicidal urges, mother would be unsupportive and unhelpful. For example, pictures of D.C. were spread around school, causing D.C. to contemplate suicide, but mother "didn't call or take [D.C.] to the hospital"—she instead "called [D.C.] a hoe and a slut." Even when D.C. was at the hospital after a "suicidal issue at school, . . . [mother] acted like she cared" when the nurse was there but "called [D.C.] attention seeking [and] a hoe" when the nurse left. And when her children did attempt suicide, mother ignored them and neglected to seek medical attention for them. In fact, just before entering foster care, W.C. attempted suicide "at least twelve times," and after one time where

W.C. overdosed on drugs, "[mother] didn't take her to the hospital." Ultimately, mother often dismissed the children's reactions as "attention seeking."[5]

After their removal, D.C. was placed in a therapeutic foster home with children of her own age. Notably, the foster home was deemed to have provided D.C. "a safe, stable, and nurturing environment," and she built a positive relationship with her foster siblings. For example, while D.C. initially attempted suicide twice after removal from mother's home but before entering foster care,[6] she reported no suicidal ideations after she was placed in her therapeutic foster home. D.C. was also enrolled in high school and received regular psychological care and medication management.

W.C. and Z.C. were also eventually placed in a therapeutic foster home located "just a few houses down from" where D.C. resided, and that foster home was also deemed to have provided W.C. and Z.C. with a "safe and nurturing environment." Z.C. began performing well in school, where he received support services through his individualized education program. In addition, after being removed from his mother's care, Z.C. participated in extracurricular activities and engaged well with his peers. Z.C. further received regular counseling and medical treatment while in foster care. Following entry into foster care, W.C. engaged in intensive

---

[5] Beyond the abuse, the children also blamed mother for L.C.'s death. L.C. suffered from a seizure disorder, and around July 4, 2020, L.C. began to experience a seizure wherein she began to vomit severely and fell unconscious. Mother "knew [that] if [L.C.] was vomiting, . . . the doctors told her to bring [L.C.] in to see the doctor immediately." Instead "[L.C.] was brought to the hospital with some delay." As a result, L.C. died shortly after arriving at the hospital.

The children recalled that mother was, in part, the primary reason for the delayed transport to the hospital, asserting that "[L.C.] died because [mother's boyfriend] was mad that [L.C.] was sick and that the sickness would interrupt fireworks." The children alleged that their "[mother] listened to [her boyfriend] and didn't take L.C. to the doctor because [he] was angry about it interrupting" the show.

[6] During this brief duration, all three kids stayed with one of mother's cousins who agreed to take them in for a short period of time but could not make a long-term commitment.

psychiatric therapy with medication management. Her psychiatric evaluation noted that the "sexual abuse [W.C.] suffered . . . has impacted her relationships with men," and she "fear[ed] people leaving her and [was] afraid of getting close to new people." Ultimately, "[l]osing her younger sister [L.C.] . . . was traumatic for [her]," and W.C. continued to grieve that loss. As a result of the therapy received during foster care, W.C. began to enjoy band in school and "participated in band concerts with her peers."

The Department also developed a plan to assist mother. The plan required mother to improve her protective capacity, to be honest about past issues, and to identify and manage her children's needs. Mother was also required to establish stable employment and transportation since she lacked sufficient financial means to support her children. The Department further required mother to engage in reunification services, grief outpatient counseling, medication management, psychological evaluation, random drug screenings, supervised visitation, and ongoing case management with a caseworker. Mother initially participated in the counseling services provided to her by the Department and sporadically attended supervised visitations with the children.

Mother's supervised visits greatly stressed the children, and they often returned to their foster homes "upset." In addition, mother's behavior during the supervised visitations showed little, if any, improvement over her abusive behavior before the children's removal. For example, during one visitation at mother's home, W.C. and Z.C. found a needle containing a dried yellow substance. Mother provided several different explanations for the needle—claiming that it was either for insulin injections, tattoos, or that the needle belonged to someone else. After "blam[ing] [the presence of the needle] on [W.C.]," she ultimately confessed that she had lied about each explanation. During another visit, mother "did not engage with the children" and "was on her phone continuously" throughout the visit. Even when asked simply to write some

words of affirmation for her children, she instead only wrote "Words of Affirmation" after initially refusing to participate in the exercise. By May of 2024, the Department suspended mother's supervised visitations with the children.

Mother's counseling sessions were also "not productive." She refused to acknowledge the children's recollections concerning her abuse of them and stated that their memories were "opinions." Mother then accused the children of "lying" and being "manipulative[] and mentally ill." Mother further denied ever having been physically abusive to her children—she only admitted that "she was 'verbally abusive and said horrible things that she can never take back.'" Hence, instead of "accept[ing] responsibility," she "blame[d] her ex-husband, 'the system,' and Nelson County."

As a result of mother continuing to "invalidate the children's reality" after having received extensive services, on July 30, 2024, the Department petitioned to terminate her parental rights and change the goal from reunification to either adoption or relative placement. On August 12, 2024, while the case was pending in the JDR court, mother moved to transfer venue to Amherst County, where she then resided. Ultimately, on August 29, 2024, the JDR court held a hearing and terminated mother's parental rights pursuant to Code § 16.1-283(B). It also approved changing the foster care goal to adoption. The JDR court also dismissed mother's motion to transfer venue the same day.

Mother appealed the JDR court's order to the circuit court for a trial de novo. On February 26, 2025, the circuit court held a hearing and terminated mother's parental rights under Code § 16.1-283(B) and (C). The circuit court also approved changing the goal to adoption. The circuit court memorialized these rulings in a final order on March 28, 2025. Mother appealed.

II. ANALYSIS

A. *Standard of Review*

"On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 699 (2022) (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)). "Whether the record is sufficiently complete to permit our review on appeal is a question of law subject to our *de novo* review." *Bay v. Commonwealth*, 60 Va. App. 520, 529 (2012).

B. *The transcript of the termination hearing was untimely filed and indispensable to resolving two of mother's assignments of error, so they are waived.*

"The transcript of any proceeding is a part of the record when it is filed in the office of the clerk of the trial court no later than 60 days after entry of the final judgment."[7] Rule 5A:8(a). In addition, "[w]hen the appellant fails to ensure that the record contains transcripts . . . necessary to permit resolution of appellate issues, any assignments of error affected by such omission will not be considered." Rule 5A:8(b)(4)(ii). Two of mother's assignments of error are impacted by these principles: 1) whether the circuit court erred by admitting evidence of mother's alleged abuse of her children which occurred outside of Nelson County; and 2) whether the circuit court failed to consider less drastic alternatives to termination.

---

[7] The same 60-day deadline applies to a written statement of facts filed in lieu of a transcript. *See* Rule 5A:8(c).

Here, mother filed a transcript in the circuit court on May 28, 2025, which was one day after the 60-day deadline. Hence, the transcript of the February 26, 2025 termination hearing before the circuit court is not a part of the record on appeal and cannot be considered when resolving assignments of error where a transcript of the hearing is indispensable. Rule 5A:8(a).

Additionally, the hearing transcript is indispensable for addressing both assignments of error. Without a transcript or statement of facts in lieu of a transcript, we are unable to review whether evidence of prior abuse allegations from other jurisdictions was admitted in evidence in error. Further, without a transcript of the termination hearing, we are unable to review any objections to or arguments concerning the admission of evidence of mother's abuse of her children while residing outside of Nelson County. Similarly, we are unable to review any less drastic alternatives to termination advocated by mother or considered by the circuit court without a transcript of the termination hearing. Plainly put, without a transcript or written statement of facts, there is *no* record evidence that we can review to address these claims. Thus, we hold that a transcript or written statement of facts in lieu of a transcript of the February 26, 2025 hearing is indispensable in the determination of mother's fourth and fifth assignments of error.

Mother's failure to ensure the inclusion of this indispensable part of the record waives her fourth and fifth assignments of error, thus we decline to review either of them.[8] Rule 5A:8(b)(4)(ii). However, since mother's remaining assignments of error can be resolved without reviewing the transcript of the termination hearing before the circuit court, we will proceed to review mother's remaining assignments of error. *See Turner v. Commonwealth*, 2 Va. App. 96, 99 (1986).

---

[8] While mother invokes the ends of justice exception to Rule 5A:18, we cannot apply this exception when we do not have the necessary transcripts to determine whether a "a miscarriage of justice has occurred." *Wandemberg v. Commonwealth*, 70 Va. App. 124, 137 (2019) (quoting *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc)); *see also* Rule 5A:8(b)(4)(ii).

C. *The circuit court did not err in terminating mother's parental rights.*

The circuit court terminated mother's parental rights under both Code § 16.1-283(B) and (C). Terminating parental rights pursuant to Code § 16.1-283(C) requires "that [the Department] . . . [meet] its burden of proving, by clear and convincing evidence: (1) that termination is in the best interests of the child; *and* (2) that the parent has not maintained a relationship with the child *or* remedied the conditions that led to foster care placement." *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 46 (2014). Mother contends that neither of these prongs are met. We disagree.

1. <u>The termination of mother's parental rights is in the children's best interests.</u>

Mother claims that the circuit court erred by finding that terminating her parental rights was in the children's best interests. We disagree.

"In determining what is in the best interests of the child, a court must evaluate and consider many factors," some of which include the children's age, their needs, and whether they are doing better in foster care than with their parent. *Welch*, 64 Va. App. at 48 (quoting *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 161 (2004)); *cf. Akers v. Fauquier Cnty. Dep't of Soc. Servs.*, 44 Va. App. 247, 264 (2004) (relying on a child "flourishing" in foster care in holding that terminating parental rights was in the child's best interests). Importantly, "'there is no simple, mechanical, "cut and dried" way' to apply the best interests of the child standard." *Welch*, 64 Va. App. at 48 (quoting *Peple v. Peple*, 5 Va. App. 414, 422 (1988)). "Instead, '[t]he question must be resolved . . . in light of the facts of each case.'" *Eaton v. Washington Cnty. Dep't of Soc. Servs.*, 66 Va. App. 317, 331 (2016) (alterations in original) (quoting *Toombs v. Lynchburg Div. of Soc. Servs.*, 223 Va. 225, 230 (1982)).

Here, the record demonstrates that the circuit court was not "plainly wrong" in holding that terminating mother's parental rights was in the children's best interest. *Simms*, 74 Va. App. at 470.

It is an understatement to say that the children withstood physical, verbal, and emotional abuse while in mother's care. By contrast, the record reflects that the children had an improved standard of living in foster care. For example, the children were placed in supportive therapeutic foster homes, located nearby, and they maintained their relationship with each other. Additionally, they also built positive relationships with their foster families. Even further, they received regular psychological, psychiatric, and medical care—which stands in stark contrast to the lack of medical care mother provided her children when they clearly needed it. Finally, the record reflects that while in foster care, the children engaged in activities that they enjoyed, such as band or other extracurricular activities.

In addition, during the two years the children were in foster care, mother made no progress toward reunification and remained unable to care for them. In addition to the factors previously discussed, "it is in the best interests of children to receive a permanent placement without languishing in the foster system." *Simms*, 74 Va. App. at 464. Hence, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming h[er] responsibilities." *Id*. at 463 (quoting *Harrison*, 42 Va. App. at 162). By contrast, the Department proposed providing the children with long-term stability through adoption or relative placement. This eventual outcome would remove the children from the long-term uncertainty of a temporary foster care placement, which would only end when their abusive mother decided to meaningfully engage in the Department's prior therapeutic plan of eventual reunification.

Based upon the facts in this case, the circuit court's judgment here was not "plainly wrong or without evidence to support it." *Simms*, 74 Va. App. at 470. Thus, we affirm the circuit court's finding that it was in the best interests of the children to terminate mother's parental rights.

- 11 -

2. The Department also adduced evidence sufficient to meet its burden pursuant to Code § 16.1-283(C)(2).

Mother also contends that the circuit court erred in determining that the Department's evidence satisfied the requirements of Code § 16.1-283(C)(2). We disagree.

Code § 16.1-283(C)(2) authorizes a court to terminate parental rights if, without "good cause," the parent has "been unwilling or unable . . . to remedy substantially the conditions which led to or required continuation of the [children's] foster care placement" within a "reasonable period of time not . . . exceed[ing] 12 months." The statute also requires a showing "that the Department made reasonable and appropriate efforts to help the parent remedy those conditions." *Joyce*, 75 Va. App. at 701. Hence, "subsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). Thus, the statute "requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he [or she] has been offered rehabilitation services." *Toms*, 46 Va. App. at 271.

Due to the allegations of abuse, the Department reasonably required mother to acknowledge her past issues, learn to protect the children, and manage the children's needs. To assist mother in reaching these goals, the Department provided mother with counseling and supervised visitation with the children. Thus, the Department satisfied its end of the bargain to provide "reasonable and appropriate efforts" for mother to remedy the "conditions which led to . . . the [children's] foster care placement." Code § 16.1-283(C)(2); *cf. Roanoke City Dep't of Soc. Servs. v. Heide*, 35 Va. App. 328, 331-333, 337 (2001) (calling a department of social service's efforts to provide counseling and treatment for alcoholism "significant efforts").

- 12 -

Mother's behavior and attitude toward the Department's efforts evince an unwillingness to remedy those conditions. For example, during one supervised visitation, mother left a needle containing an unknown substance in her house and, instead of taking responsibility for it, blamed her children for its presence. And before other visits, the children were anxious and stressed about merely being in mother's presence again, showing that fears of abuse by her persisted during the supervised visits. Additionally, mother's ambivalence toward rehabilitating her relationship with her children is striking. For example, she was "continuously" on her phone during some visitations, and she was facetiously resistant in providing words of affirmation toward her children. And despite engaging in counseling services, mother failed to take any accountability for her past behavior. She continued to discount the children's recollections—labeling them as mere "opinions"—and even accused them of lying. Further, there is no evidence in the record that mother attempted to address W.C.'s trauma around L.C.'s death in any way. Finally, even with the mountain of evidence demonstrating that mother physically abused her children, she steadfastly denied that such abuse took place, instead seemingly blaming everyone except herself.

Hence, based on the record, we find no error in the circuit court's conclusion that mother was unwilling or unable to remedy the problems that led to the children's removal. Thus, the Department met its burden under Code § 16.1-283(C)(2). Therefore, the record evidence compels

us to conclude the circuit court did not err in terminating mother's parental rights. [9] Accordingly,

we affirm the circuit court's judgment.[10]

### III. CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*

---

[9] Having found that the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2), we need not address termination under Code § 16.1-283(B). *See Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 8 (2005) (affirming termination of parental rights under one subsection of Code § 16.1-283 and declining to address termination of parental rights under another subsection).

[10] Mother's final claim is that the circuit court erred when denying her motion to transfer venue for making unsatisfactory findings on the statutory factors under Code § 8.01-265. She also alleges that denying her motion to transfer venue was in violation of her due process rights. However, we cannot consider this argument because we do not have jurisdiction over the matter.

In termination-of-parental-rights cases, this Court may only hear appeals from circuit court judgments. *See* Code § 17.1-405(A)(3) (permitting appeals in "a civil matter" from a circuit court); *see also* Code § 8.01-267.8(B) (permitting interlocutory appeals from a circuit court). Here, mother moved the JDR court to transfer venue but there is no evidence in the record that mother similarly moved the *circuit court* to transfer venue. Thus, we cannot exercise jurisdiction over mother's assignment of error regarding venue.